# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2013AP1532 |
| COMPLETE TITLE: | Ash Park, LLC, |
| | Plaintiff-Respondent-Petitioner, |
| | v. |
| | Alexander & Bishop, Ltd., |
| | Defendant, |
| | Re/Max Select, LLC, |
| | Intervening-Defendant-Appellant, |
| | Ash Investors, LLC, |
| | Intervenor. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 356 Wis. 2d 249, 853 N.W.2d 618)
(Ct. App. 2014 – Published)
PDC No. 2014 WI App 87

| | |
|---|---|
| OPINION FILED: | July 7, 2015 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 4, 2015 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Brown |
| JUDGE: | William M. Atkinson |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | ROGGENSACK, C. J. concurs (Opinion filed). |
| DISSENTED: | |
| NOT PARTICIPATING: | PROSSER, J. did not participate. |

ATTORNEYS:

For the plaintiff-respondent-petitioner, briefs were filed by *George Burnett* and the *Law Firm of Conway, Olejniczak & Jerry, S.C.,* Green Bay, and oral argument by *George Burnett.*

For the intervening-defendant-appellant, briefs were filed by *Michael O. Marquette* and Marquette Law-Attorneys, S.C., Green Bay, and oral argument by *Michael O. Marquette.*

For the intervenor, there was a brief by Bridget M. Hubing and *Reinhart Boerner Van Deuren, S.C.,* Waukesha, and oral argument by *J. Bushnell Nielsen.*

An amicus curiae brief was filed by *Debra P. Conrad* for the *Wisconsin Realtors Association,* Madison.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2013AP1532
(L.C. No. 2007CV2832)

STATE OF WISCONSIN : IN SUPREME COURT

Ash Park, LLC,

      Plaintiff-Respondent-Petitioner,

  v.

Alexander & Bishop, Ltd.,

      Defendant,

Re/Max Select, LLC,

      Intervening-Defendant-Appellant,

Ash Investors, LLC,

      Intervenor.

**FILED**

**JUL 7, 2015**

Diane M. Fremgen
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 SHIRLEY S. ABRAHAMSON, J. This is a review of a published decision of the court of appeals.[1] The sole question presented is whether Ash Park, LLC (the seller of a parcel of vacant land) is liable to pay a broker's commission to Re/Max Select, LLC (the broker for the land).

---

[1] Ash Park, LLC v. Alexander & Bishop, Ltd., 2014 WI App 87, 356 Wis. 2d 249, 853 N.W.2d 618.

¶2 The one-party listing contract between Ash Park and Re/Max provides in relevant part that Ash Park shall pay a broker's commission to Re/Max if Ash Park enters into an "enforceable contract" for the sale of the land. Ash Park entered into a contract for the sale of the land with Alexander & Bishop, Ltd. Whether Re/Max is entitled to a broker's commission turns on whether the purchase contract between Ash Park and Alexander & Bishop constitutes an "enforceable contract" within the meaning of the listing contract between Ash Park and Re/Max, even though Alexander & Bishop breached and the sale of the land was never consummated.

¶3 The Circuit Court for Brown County, William M. Atkinson, Judge, granted summary judgment to Ash Park, declaring that Ash Park owed no broker's commission to Re/Max. The circuit court ordered Re/Max's broker lien discharged from the property.

¶4 The court of appeals reversed the circuit court's summary judgment and remanded the cause to the circuit court with instructions to determine and award Re/Max its broker's commission, prejudgment interest, costs, and reasonable attorney's fees. The court of appeals further instructed the circuit court to determine whether Re/Max's broker lien should be reinstated.

¶5 This court granted review of the sole issue presented by Ash Park in its petition for review:

> Is a vacant land offer to purchase an "enforceable contract" so as to require a seller to pay three

2

hundred seventy-eight thousand dollars ($378,000) in commission under a real estate listing contract when the seller obtained a judicial order for specific performance, but the buyer (who the realtor found) lacked the funds to purchase and could not be compelled to honor that order?

¶6 We did not grant review of the issue of whether Re/Max's broker lien should be reinstated.[2]

¶7 We now affirm the decision of the court of appeals. We conclude that the purchase contract between Ash Park and Alexander & Bishop constitutes an "enforceable contract" within the meaning of the listing contract between Ash Park and Re/Max. Re/Max is therefore entitled to a broker's commission from Ash Park even though Alexander & Bishop breached the purchase contract and the sale was never consummated.

I

¶8 The facts are undisputed for purposes of this review.

¶9 Ash Park wished to sell a parcel of vacant land located in the Village of Ashwaubenon in Brown County, Wisconsin.

¶10 On March 12, 2007, Ash Park and Re/Max entered into a one-party listing contract. Ash Park and Re/Max used a standard form contract (titled "WB-3 VACANT LAND LISTING CONTRACT") approved by the Wisconsin Department of Regulation and Licensing.

---

[2] Because this court did not grant review of the broker lien issue, the court of appeals' decision on that issue still stands. Whether the broker lien should be reinstated must be determined by the circuit court on remand.

¶11 The listing contract provided that the list price would be $6.2 million and that the listing would be for Alexander & Bishop only. It further provided that Re/Max would be entitled to a broker's commission equal to six percent of the purchase price if, during the term of the listing, Ash Park "sells or accepts an offer which creates an enforceable contract for the sale of all or any part of the Property."

¶12 During the term of the listing, Alexander & Bishop offered to purchase Ash Park's land for $6.3 million ($100,000 more than the list price). Ash Park accepted the offer.

¶13 Alexander & Bishop's offer to purchase Ash Park's land did not include a financing contingency. It did, however, include a lease contingency. The lease contingency provided that the "Offer is contingent upon the Buyer negotiating a lease [o]r leases for the subject property with terms and conditions acceptable to the Buyer . . . within [120] days of [the seller's] acceptance" of the offer. The lease contingency further provided that if Alexander & Bishop were "unable to negotiate a lease or leases," Alexander & Bishop could terminate the offer.

¶14 Because Alexander & Bishop was unable to negotiate an acceptable lease within the specified timeframe, it exercised its right to terminate the offer.

¶15 Later on, however, Ash Park and Alexander & Bishop signed an agreement to reinstate the offer.

¶16 Alexander & Bishop did not exercise its right to terminate the reinstated offer. Alexander & Bishop's offer to

4

purchase Ash Park's land ripened into a binding purchase contract on September 20, 2007.

¶17 On October 9, 2007, Alexander & Bishop informed Ash Park that the party with whom it had been negotiating a lease was not interested in immediately leasing the property. Accordingly, Ash Park and Alexander & Bishop discussed potential modifications to the purchase contract. Their negotiations were unsuccessful.

¶18 The closing of the sale, which had been scheduled for December 14, 2007, did not take place. Alexander & Bishop failed to purchase the property.

¶19 Shortly after the date that had been set for closing, Ash Park sued Alexander & Bishop, seeking specific performance of the purchase contract. Ash Park prevailed in the circuit court, in the court of appeals,[3] and in this court.[4]

¶20 Despite the specific performance judgment against it, Alexander & Bishop failed to pay for or acquire the property.

¶21 In December 2010, after protracted litigation and after Alexander & Bishop had threatened bankruptcy, Ash Park and Alexander & Bishop agreed to settle their dispute. Alexander & Bishop paid Ash Park $1.5 million. This sum was equivalent to Ash Park's holding costs, that is, the interest and other

---

[3] Ash Park, LLC v. Alexander & Bishop, Ltd., 2009 WI App 71, 317 Wis. 2d 772, 767 N.W.2d 614.

[4] Ash Park, LLC v. Alexander & Bishop, Ltd., 2010 WI 44, 324 Wis. 2d 703, 783 N.W.2d 294.

charges Ash Park had paid while it unsuccessfully sought to compel Alexander & Bishop to purchase the property.[5]

¶22 On January 12, 2011, prior to final adjudication of the lawsuit between Ash Park and Alexander & Bishop, Re/Max filed a motion to intervene.

¶23 Re/Max argued that Ash Park had entered into an "enforceable contract for the sale of all or any part of the Property" and thus that under the listing contract, Re/Max had earned a six-percent broker's commission. Re/Max sought to claim its commission, along with prejudgment interests, costs, and attorney fees. Re/Max also sought to enforce a broker lien it had recorded on the property.

¶24 Ash Park asserted various affirmative defenses and moved for summary judgment. Re/Max opposed Ash Park's motion for summary judgment and filed its own motion for summary judgment.

¶25 The circuit court granted Ash Park's motion for summary judgment and ordered Re/Max's broker lien discharged from the property. The circuit court concluded that the purchase contract between Ash Park and Alexander & Bishop does not constitute an "enforceable contract" within the meaning of

---

[5] Ash Park did not share any portion of this settlement with Re/Max, and Re/Max does not assert that it is entitled to any portion of this settlement. Re/Max acknowledges that the listing contract grants Re/Max the right to six percent of the purchase price. Explicitly excluded from the purchase price are "holding costs." As explained above, the settlement paid by Alexander & Bishop amounts to holding costs.

the listing contract between Ash Park and Re/Max.  Accordingly, the circuit court determined that Re/Max had not earned a broker's commission.

¶26  The circuit court explained its reasoning as follows:

> This contract is not enforceable.  Now, perhaps we don't do a good enough job of defining "enforceable." Maybe we should have a phrase called "enforceable in law," and maybe that would make sense because I found it was enforceable in law, that the case could proceed through the court system, but it clearly wasn't enforceable in fact.  If it was enforceable in fact, Alexander & Bishop would [have bought the land] and the realtor would have his commission.  Everybody would end up happy. . . .
>
> . . . .
>
> The reality of it is the realtor brought to these sellers a buyer who couldn't afford to buy the property. . . . [H]e couldn't get financing for it, he didn't have enough money in a bank account, he didn't have a deep enough pocket to go to, he couldn't do it. In the end this contract was not enforceable in fact and that's why the contract between these parties required it actually be enforceable in fact.

¶27  After the circuit court issued its decision, Ash Park sold the land to Ash Investors, LLC.[6]

¶28  The court of appeals reversed the circuit court's summary judgment, holding that the purchase contract between Ash Park and Alexander & Bishop constitutes an "enforceable

---

[6] Ash Investors, the company that purchased Ash Park's land after Ash Park settled its dispute with Alexander & Bishop, filed a motion to intervene (or, in the alternative, to file a non-party brief) in this court.  The court granted Ash Investors' motion to intervene, permitting Ash Investors to file a brief in this court but only on the issue the court had accepted for review.

contract" within the meaning of the listing contract between Ash Park and Re/Max.  The court of appeals reasoned as follows:

> We conclude the term "enforceable contract" is plain and unambiguous.  Given the dictionary definition of "enforce" and the principle that an "enforceable contract" is one that provides a remedy for a breach, it is clear that an "enforceable contract" is one where an individual can compel observance of the contract by seeking a remedy for a breach.  In this case, the contract between Ash Park and Alexander & Bishop was enforceable——the contract recognized Ash Park's rights under the contract and provided various remedies for Ash Park based on Alexander & Bishop's breach.[7]

¶29 The court of appeals cited the "law of the case" doctrine as an additional rationale for its conclusion that the purchase contract between Ash Park and Alexander & Bishop is enforceable.  According to the court of appeals, this court's prior decision that specific performance was a permissible remedy for Alexander & Bishop's breach of the purchase contract settled the issue of the contract's enforceability.  The court of appeals explained its reasoning as follows:

> [W]e conclude the law of the case doctrine applies to prevent Ash Park from arguing the contract it had with Alexander & Bishop was unenforceable.  "The law of the case doctrine is a 'longstanding rule that a decision on a legal issue by an appellate court establishes the law of the case, which must be followed in all subsequent proceedings in the trial court or on later appeal.'" . . . .
>
>       . . .

---

[7] _Ash Park_, 356 Wis. 2d 249, ¶15.

[T]he specific performance remedy Ash Park sought and received for Alexander & Bishop's breach in this case was available only if the parties had an <u>enforceable</u> contract. Based on the specific performance judgment Ash Park sought and received in this case, Ash Park cannot now argue its contract with Alexander & Bishop was unenforceable.[8]

¶30 We granted Ash Park's petition for review of the court of appeals' decision, limiting our review to the question of whether the purchase contract between Ash Park and Alexander & Bishop constitutes an "enforceable contract" under the listing contract between Ash Park and Re/Max, such that Re/Max is entitled to a broker's commission.

II

¶31 This court reviews summary judgment decisions independently, applying the same standards and methods as the circuit court.[9] Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[10]

¶32 In the instant case, the parties do not dispute the facts. Rather, the parties dispute whether as a matter of law Re/Max is entitled to a broker's commission. This issue turns on whether the purchase contract between Ash Park and Alexander

---

[8] Id., ¶¶19-20 (citations omitted).

[9] Roehl Transport, Inc. v. Liberty Mut. Ins. Co., 2010 WI 49, ¶25, 325 Wis. 2d 56, 784 N.W.2d 542.

[10] Wis. Stat. § 802.08(2) (2011-12). All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

& Bishop constitutes an "enforceable contract" within the meaning of the listing contract between Ash Park and Re/Max. The interpretation of a contract presents a question of law that this court decides independently of the circuit court and court of appeals but benefiting from their analyses.[11]

### III

¶33 To decide whether Re/Max is entitled to a broker's commission under the listing contract between Ash Park and Re/Max, we must interpret the phrase "enforceable contract" in the listing contract. Thus, we begin by reviewing the principles of contract interpretation that govern our analysis. We then apply those interpretive principles to the phrase "enforceable contract" in the listing contract. We conclude that the purchase contract between Ash Park and Alexander & Bishop constitutes an "enforceable contract" within the meaning of the listing contract. Ash Park's arguments to the contrary are not convincing.

### A

¶34 The court's goal in interpreting a contract is to give effect to the parties' intentions.[12] However, "subjective intent

---

[11] Tufail v. Midwest Hospitality, LLC, 2013 WI 62, ¶22, 348 Wis. 2d 631, 833 N.W.2d 586; Ehlinger v. Hauser, 2010 WI 54, ¶47, 325 Wis. 2d 287, 785 N.W.2d 328.

[12] Seitzinger v. Cmty. Health Network, 2004 WI 28, ¶22, 270 Wis. 2d 1, 676 N.W.2d 426.

10

is not the be-all and end-all."[13]  The language of the contract controls the court's interpretation.[14]

¶35 When the terms of a contract are clear and unambiguous, we construe the contract's language according to its literal meaning.[15]  "We presume the parties' intent is evidenced by the words they choose, if those words are unambiguous."[16]

¶36 When the terms of a contract are ambiguous, however, evidence extrinsic to the contract itself may be used to determine the parties' intent, and any remaining ambiguities will be construed against the drafter.[17]  "A contract provision is ambiguous if it is fairly susceptible of more than one construction."[18]

¶37 Contract language is construed according to its plain or ordinary meaning,[19] consistent with "what a reasonable person

---

[13] Kernz v. J.L. French Corp., 2003 WI App 140, ¶9, 266 Wis. 2d 124, 667 N.W.2d 751.

[14] Seitzinger, 270 Wis. 2d 1, ¶22.

[15] Maryland Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶23, 326 Wis. 2d 300, 786 N.W.2d 15 (quoting Gorton v. Hostak, Henzl & Bichler, S.C., 217 Wis. 2d 493, 506, 577 N.W.2d 617 (1998)).

[16] Kernz, 266 Wis. 2d 124, ¶9.

[17] Maryland Arms, 326 Wis. 2d 300, ¶23.

[18] Mgm't Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996).

[19] Huml v. Vlazny, 2006 WI 87, ¶52, 293 Wis. 2d 169, 716 N.W.2d 807.

would understand the words to mean under the circumstances."[20] Language in a business contract is construed in the manner in which it would be understood "by persons in the business to which the contract relates."[21] Interpretations that give reasonable meaning to each provision in the contract are preferred over interpretations that render a portion of the contract superfluous.[22]

¶38 Ultimately, the court's role "is not to make contracts or reform them but to determine what the parties contracted to do."[23] "It is not the function of the court to relieve a party to a freely negotiated contract of the burdens

---

[20] Seitzinger, 270 Wis. 2d 1, ¶22.

[21] Columbia Propane, L.P. v. Wis. Gas Co., 2003 WI 38, ¶12, 261 Wis. 2d 70, 661 N.W.2d 776.

[22] Sonday v. Dave Kohel Agency, Inc., 2006 WI 92, ¶21, 293 Wis. 2d 458, 718 N.W.2d 631.

[23] Marion v. Orson's Camera Centers, Inc., 29 Wis. 2d 339, 345, 138 N.W.2d 733 (1966) (quoting Wis. Marine & Fire Ins. Co. Bank v. Wilkin, 95 Wis. 111, 115, 69 N.W. 354 (1896)).

See also 11 Richard A. Lord, Williston on Contracts § 32:2 (4th ed. 2002) ("Courts often recite that they cannot make a new contract for the parties, but can only enforce the contract to which the parties themselves have agreed, and if the contract contains unambiguous language, the parties are bound by its plain meaning.").

of a provision which becomes more onerous than had originally been anticipated."[24]

¶39 We now apply these interpretive principles to the contract language at issue.

B

¶40 The section of the listing contract between Ash Park and Re/Max that discusses the seller's obligation to pay a broker's commission contains five clauses that delineate the circumstances under which Ash Park shall pay Re/Max a commission. It provides the following alternative conditions under which a commission shall be earned:

> **COMMSSION:** Seller shall pay Broker's commission, which shall be earned if, during the term of this Listing:
>
> 1) Seller sells or accepts an offer which creates an enforceable contract for the sale of all or any part of the Property;
>
> 2) Seller grants an option to purchase all or any part of the Property which is subsequently exercised;
>
> 3) Seller exchanges or enters into a binding exchange agreement on all or any part of the Property;
>
> 4) A transaction occurs which causes an effective change in ownership or control of all or any part of the Property; or

---

[24] 25 Lord, supra note 23, § 1:1. See also E. Allan Farnsworth, 2 Farnsworth on Contracts § 5.1, at 1 (3rd ed. 2004) ("[F]reedom of contract rests on the premise that it is in the public interest to accord individuals broad powers to order their affairs through legally enforceable agreements. In general, therefore, parties are free to make such agreements as they wish, and courts will enforce them without passing on their substance.").

5) _A purchaser is procured for the Property_ by Broker, by Seller, or by any other person, at the price and on substantially the same terms set forth in this Listing and in the standard provisions of the current WB-13 VACANT LAND OFFER TO PURCHASE, even if Seller does not accept this purchaser's offer. . . .

(Emphasis added.)

¶41 The listing contract goes on to define "procured" for purposes of the fifth clause set forth above:

_A purchaser is procured when a valid and binding contract of sale is entered into_ between the Seller and the purchaser or when a ready, willing and able purchaser submits a written offer at the price and on substantially the terms specified in this listing.

(Emphasis added).

¶42 The listing contact does not define the phrase "enforceable contract," which appears in the first clause, and the parties dispute its meaning.

¶43 Our interpretation of the phrase "enforceable contract" begins, as it must, with the ordinary meaning of the phrase.

¶44 In everyday language, "enforceable" means capable of being enforced. A contract is "enforceable" if it can be enforced.

¶45 A party seeks to "enforce" a contract by going to court to obtain a remedy for the contract's breach. A court "enforces" a contract by issuing a judgment that grants a remedy

14

for the contract's breach.[25]   Consequently, a reasonable person would consider a contract "enforceable" so long as a party to the contract can go to court and obtain a remedy for the contract's breach.

¶46 This ordinary interpretation of the phrase "enforceable contract" comports with the phrase's legal meaning. "Enforceable contracts are those for which the law recognizes the parties' rights and protects those rights by providing a remedy for breach, usually either some measure of damages or specific performance."[26]   Calamari and Perillo on Contracts explains that a contract is said to be enforceable "[w]hen a promisee is entitled to either a money judgment, an injunction or specific performance because of a breach [by the promisor]."[27]

¶47 The converse is also true: "Unenforceable contracts are those that, because of some valid defense . . . , lack the remedy of specific performance or damages in the event of

---

[25] "In most contract cases, what is sought is enforcement of a contract.  Enforcement usually takes the form of an award of a sum of money due under the contract or as damages. . . .  A court may also enforce a promise by ordering that it be specifically performed or, in the alternative, by enjoining its non-performance."  Restatement (Second) of Contracts § 345, cmt. b (1981).  See also 1 E. Allan Farnsworth, Farnsworth on Contracts § 1.1, at 4 (3d ed. 2004) (explaining that a contract is "a promise, or a set of promises, that the law will enforce").

[26] 1 Michael B. Apfeld et al., Contract Law in Wisconsin § 1.22 (4th ed. 2013).

[27] Joseph M. Perillo, Calamari and Perillo on Contracts § 1:8(b) (7th ed. 2014).

breach . . . ."[28] Put more simply, "[a]n unenforceable contract is one for the breach of which neither the remedy of damages nor the remedy of specific performance is available . . . ."[29]

¶48 Nothing in the record reveals that the phrase "enforceable contract" has a meaning in the real estate business that is different from its ordinary and legal meaning.

¶49 As we explained previously, Alexander & Bishop failed to purchase Ash Park's land as it had contracted to do, and Ash Park sought the remedy of specific performance for Alexander & Bishop's breach. The circuit court issued a specific performance judgment against Alexander & Bishop that was upheld by the court of appeals[30] and by this court.[31]

¶50 Because Ash Park was indisputably able to compel observance of the purchase contract it entered into with Alexander & Bishop by seeking a remedy (namely specific performance) for a breach, the purchase contract falls within the ordinary and legal meaning of the phrase "enforceable contract." Indeed, in upholding the specific performance

---

[28] 1 Apfeld et al., supra note 26, § 1.22.

[29] 25 Lord, supra note 23, § 1:21. See also Perillo, supra note 27, § 1:8(b) ("Unenforceable contracts are those which have some legal consequences but which may not be enforced in an action for damages or specific performance in the face of certain defenses . . . ." (Emphasis added.)).

[30] Ash Park, LLC v. Alexander & Bishop, Ltd., 2009 WI App 71, 317 Wis. 2d 772, 767 N.W.2d 614.

[31] Ash Park, LLC v. Alexander & Bishop, Ltd., 2010 WI 44, 324 Wis. 2d 703, 783 N.W.2d 294.

judgment against Alexander & Bishop, this court made clear that the purchase contract between Ash Park and Alexander & Bishop is enforceable.[32]

¶51 In the instant case, Ash Park asks the court to interpret the phrase "enforceable contract" in a manner inconsistent with the phrase's ordinary and legal meaning and inconsistent with this court's previous decision to enforce the purchase contract between Ash Park and Alexander & Bishop. We decline to accept this invitation.

¶52 We conclude that the purchase contract between Ash Park and Alexander & Bishop constitutes an "enforceable contract" within the meaning of the listing contract between Ash Park and Re/Max. It has already been enforced.

C

¶53 Ash Park sets forth two primary counterarguments: (1) because Alexander & Bishop was not compelled to satisfy the specific performance judgment against it, the purchase contract is, as a matter of fact, not enforceable; and (2) requiring Ash Park to pay a broker's commission when the sale to Alexander & Bishop was never consummated would be contrary to public policy.

---

[32] In upholding the specific performance judgment against Alexander & Bishop, this court distinguished <u>Henrikson v. Henrikson</u>, 143 Wis. 314, 127 N.W. 962 (1910), in which "there was no valid and enforceable contract to transfer land." <u>Ash Park</u>, 324 Wis. 2d 703, ¶44. The court explained that <u>Henrikson</u> was not controlling in the <u>Ash Park</u> case because <u>Henrikson</u> "does not address the remedies available to a seller when the buyer breaches an enforceable contract for the sale of land." <u>Id.</u>, ¶44.

¶54 We address these counterarguments in turn.

(1)

¶55 First, Ash Park contends that the court system's inability to successfully compel Alexander & Bishop's performance means the purchase contract between Ash Park and Alexander & Bishop is not enforceable. Ash Park grounds this argument on an unconvincing interpretation of the phrase "enforceable contract" and on a comparison of the first and fifth clauses of the listing contract's commission section.

¶56 Relying on the reasoning of the circuit court, Ash Park argues that the phrase "enforceable contract" in the listing contract is ambiguous.

¶57 According to Ash Park, one meaning of "enforceable contract" is a contract enforceable "in fact." Under this interpretation of the phrase, a contract is enforceable only if a breaching party can be forced to perform.

¶58 Another meaning of "enforceable contract," says Ash Park, is a contract enforceable "in law." Under this interpretation of the phrase, a contract is enforceable if a remedy is available for a breach.

¶59 Ash Park contends that the former interpretation (under which a contract is "enforceable" only if it is enforceable "in fact") is the better one. Ash Park reminds the court that ambiguities in a contract are construed against the drafter (here, Re/Max).

¶60 Ash Park also contends that its preferred interpretation comports with the expectations of a reasonable

seller. In Ash Park's view, a reasonable seller who signs a listing contract never intends to incur an obligation to pay a broker's commission when the listed property is not actually sold, that is, when the seller does not receive the purchase price from a buyer. A seller who enters into a listing contract does not intend to be in debt for a commission when no transfer of the property has taken place.

¶61 Next, Ash Park asserts that construing the phrase "enforceable contract" to mean a contract that is enforceable "in law" would render the fifth clause of the commission section of the listing contract superfluous.

¶62 The fifth clause of the commission section of the listing contract entitles Re/Max to a commission if Ash Park enters a "valid and binding contract" for the sale of the land. According to Ash Park, if the court interprets "enforceable contract" to mean a contract enforceable "in law," then no difference exists between the phrases "valid and binding contract" and "enforceable contract." To give meaning to both the first and fifth clauses of the commission section of the listing contract, Ash Park asserts that the court should interpret the phrase "enforceable contract" to mean a contract enforceable "in fact."

¶63 We decline to adopt Ash Park's proffered interpretation of the phrase "enforceable contract."

¶64 Ash Park's argument that the phrase "enforceable contract" is ambiguous confuses the issue of enforceability of a contract with the concept of satisfaction of a judgment. The

19

enforceability of a contract turns on whether there is a remedy available for a breach, not on whether a judgment issued in response to a breach is satisfied.

¶65 There is no distinction in the law or in ordinary language between the enforceability of a contract "in law" and "in fact."  Nor does the listing contract draw such a distinction:  The listing contract states that Ash Park shall pay Re/Max a broker's commission if Ash Park enters into an <u>enforceable</u> contract for the sale of the land, not an <u>enforceable in fact</u> contract for the sale of the land.

¶66 We will not read words into the contract that the parties opted not to include.  Rather, we apply contractual language as it is written.  This court's role, after all, is "not to make [the] contract[] . . . but to determine what the parties contracted to do."[33]

¶67 Further, despite Ash Park's protestations, interpreting the phrase "enforceable contract" to mean a contract enforceable "in law" does not render the fifth clause of the commission section of the listing contract mere surplusage.

¶68 The phrases "valid and binding" and "enforceable" have been interpreted in varied and sometimes overlapping ways in

---

[33] <u>Tufail</u>, 348 Wis. 2d 631, ¶29.

contract law.[34] Nevertheless, the phrases are not synonymous in the legal literature.

¶69 As one commentator has explained, a contract is "valid and binding" if "all of the elements of contract formation have been satisfied and there are no fundamental defenses to the enforcement of the contract, such as the statute of frauds."[35] Because the phrase "'valid and binding' relates to contract formation, [] 'enforceable' must mean something else. Most lawyers believe that the term 'enforceable' implies the existence of a remedy for breach, such as an action at law for damages."[36]

¶70 In sum, our interpretation of the phrase "enforceable contract" within the listing contract——the issue raised in the petition for review——comports with the phrase's ordinary and legal meaning and does not render the "valid and binding" portion of the listing contract superfluous.  We therefore reject Ash Park's alternative interpretation of the contractual language and conclude that the failure of Ash Park and the courts to successfully compel Alexander & Bishop's performance

---

[34] "Some authorities distinguish among the concepts of legal, valid, binding, and enforceable."  Gregory G. Gosfield, A Primer in Real Estate Options, 35 Real Prop. Prob. & Tr. J. 129, 137 n.10 (2000) (discussing the differences between these words).

[35] Laurence G. Preble, The Remedies Opinion Revisited: A Primer for Real Estate Lawyers, 33 Real Prop. Prob. & Tr. J. 63, 68 (1998).

[36] Id., 70-71.

does not mean the purchase contract between Ash Park and Alexander & Bishop was not enforceable.

(2)

¶71 Ash Park's second primary counterargument to the determination of the court of appeals and this court that Re/Max is entitled to a commission is that requiring Ash Park to pay a commission when the sale to Alexander & Bishop was never consummated would be contrary to public policy. There are two components to this argument.

¶72 First, Ash Park urges the court to recognize the practical consequences of requiring it to pay Re/Max's commission in the instant case. Ash Park did not profit from the purchase contract it entered into with Alexander & Bishop despite its attempts to enforce that contract,[37] and Ash Park will now pay $378,000 out of pocket to Re/Max as a commission. Had Ash Park declined to enforce the purchase contract, it would have retained a portion of the earnest money and would not be paying $378,000 out of pocket.[38]

---

[37] Ash Park did not earn a profit by settling with Alexander & Bishop. As previously explained, the $1.5 million settlement Alexander & Bishop paid to Ash Park reflected Ash Park's costs for maintaining the property during the time the purchase contract was being litigated.

[38] The earnest money provision of the listing contract provides that if the sale "fails to close and the earnest money is disbursed to Seller, then . . . the earnest money shall be paid first to reimburse Broker for cash advances . . . and one half of the balance, but not in excess of the agreed commission, shall be paid to Broker as Broker's full commission . . . ."

¶73 Thus, Ash Park contends that "[t]he natural consequence of this decision is that innocent sellers face a Hobson's choice: try to enforce the contract as the law allows or abdicate these legal rights lest the realtor claim hundreds of thousands of dollars in commission."

¶74 Second, Ash Park contends that this court's interpretation of the phrase "enforceable contract" defies the purpose of the listing contract, which is to effectuate a sale of the property by employing a broker to locate a buyer.[39] Ash Park states: "Suddenly the realtor is no longer the servant of the seller; the seller becomes the servant of the realtor. Nothing in this contract discloses such a counterintuitive understanding."

¶75 Ash Park's frustration is understandable.  Ash Park has done its best to effectuate the sale of its land to Alexander & Bishop.  Ash Park agrees that had Alexander & Bishop paid for the property (as it was required by law to do), then Re/Max would be entitled to a broker's commission.  But Alexander & Bishop did not pay, and Ash Park did not receive the benefit of its purchase contract.  If Ash Park is required to pay a commission to Re/Max under these circumstances, what will it be paying for?  In Ash Park's view, Re/Max procured "a buyer

<hr/>

[39] Harvey L. Temkin et al., Commercial Real Estate Transactions in Wisconsin, § 2.3 (2010) (explaining that under a listing contract, "a seller hires a broker to find a buyer").

unable to perform" and thus "supplie[d] nothing of value . . . ."

¶76 The result in the instant case does seem harsh to Ash Park. But the result would be harsh to Re/Max were we to hold in Ash Park's favor.

¶77 Re/Max did what it agreed to do under the listing contract. Upon Re/Max's listing the property, Alexander & Bishop made an offer for more than the listing price and Ash Park accepted that offer, creating an enforceable contract for the sale of the property. Because an enforceable contract for the sale of the property was created, Re/Max earned a commission under the listing contract. Declining to order Ash Park to pay Re/Max its commission is not only contrary to the contract language; it is also unfair to Re/Max, which expended efforts to locate a buyer.

¶78 By asking the court to disregard the contract language to achieve what it views as a fairer result, Ash Park in effect asks us to relieve "a party to a freely negotiated contract of the burdens of a provision which becomes more onerous than had originally been anticipated."[40] As we explained previously, this is not the court's role.[41]

---

[40] 25 Lord, supra note 23, § 1:1.

[41] The court's role "is not to make contracts or reform them but [rather] to determine what the parties contracted to do." Marion v. Orson's Camera Ctrs., Inc., 29 Wis. 2d 339, 345, 138 N.W.2d 733 (1966) (quoting Wis. Marine & Fire Ins. Co. Bank v. Wilkin, 95 Wis. 111, 115, 69 N.W. 354 (1897)).

¶79 Ash Park also overlooks the fact that it had the power to condition Re/Max's right to receive a commission upon consummation of the sale.

¶80 Ash Park and Re/Max used the listing contract prepared and approved by Wisconsin's Real Estate Examining Board (REEB).[42] REEB-approved listing contracts can be modified; their terms are not set in stone. Existing provisions can be changed or deleted and additional provisions can be appended.[43]

¶81 Ash Park could have negotiated with Re/Max to modify the terms of the commission section of the listing contract by conditioning Re/Max's right to a commission on consummation of the sale. Indeed, one commentator has advised: "To avoid incurring a commission without a closing, the seller's lawyer should consider modifying the language in [the listing contract] so that the commission is not earned until the conveyance of the property actually closes and title passes."[44]

¶82 This court cannot disregard contract terms that Ash Park belatedly decides are unacceptable.

¶83 Finally, Wisconsin case law demonstrates that a broker's commission is not ordinarily contingent upon the sale's consummation.

---

[42] Wis. Admin. Code § REEB 16.03 (May 2014) ("Approved forms").

[43] Wis. Admin. Code § REEB 16.06 (May 2014) ("How to use prepared forms").

[44] See Temkin et al., supra note 39, § 2.20.

¶84 This court has previously declared that a broker is entitled to a commission if the broker identifies a buyer and the buyer and seller enter into an enforceable contract for the sale of the property, even if the sale fails to close.[45]

¶85 In Wauwatosa Realty Co. v. Paar, 274 Wis. 7, 79 N.W.2d 125 (1956), a buyer procured by the broker entered into a purchase contract with the seller.  The buyer refused to purchase the property.  The listing contract did not condition payment of the broker's commission on final consummation of the transaction.  Accordingly, the Wauwatosa Realty court stated that the broker was entitled to its commission despite the buyer's default:  "[T]he broker's right to his commission is not defeated by a subsequent default on the [buyer's] part unless

_____

[45] Scott C. Minter & Debra Peterson Conrad, Wisconsin Real Estate Law 5-19 (2014); John L. Horwich et al., Real Estate Transactions System § 1.8c (5th ed. 2011).  See also Winston v. Minkin, 63 Wis. 2d 46, 51, 216 N.W.2d 38 (1974); Wauwatosa Realty Co. v. Paar, 274 Wis. 7, 14-15, 79 N.W.2d 125 (1956); McDermott v. Mahoney, 115 N.W. 32, 36-37 (1908).

See Minter & Conrad, supra, at 5-17.

The listing contract can provide that the broker will not earn a commission unless the sale closes.  See, e.g., Mansfield v. Smith, 88 Wis. 2d 575, 586-89, 277 N.W.2d 740 (1979) (general rule that seller owes broker commission if seller enters contract with buyer, even if buyer later defaults, was not applicable per a liquidated damages clause); Walter Kassuba, Inc. v. Bauch, 38 Wis. 2d 648, 158 N.W.2d 387 (1968) (listing contract provided for payment of a broker's commission if the property "is sold," which in the circuit court's view meant the sale had to be completed; this court remanded the cause to the circuit court to determine what the parties intended the words "is sold" to mean in the case at hand).

[the seller's] promise to the broker is expressed to be conditioned upon such actual performance by the [buyer]. . . ."[46]

¶86 The court reached a similar conclusion in Kruger v. Wesner, 274 Wis. 40, 44, 79 N.W.2d 354 (1956). In Kruger, the contract between the seller and the broker provided that the broker would procure a buyer. The broker procured a buyer, and the buyer and seller entered into a purchase contract. The buyer breached the purchase contract. Because the sale was not consummated, the seller refused to pay the broker's commission.

¶87 The Kruger court, like the Wauwatosa Realty court, determined that the broker was entitled to a commission notwithstanding the buyer's breach. The Kruger court explained:

> The courts are practically unanimous in holding that a broker employed to sell [] lands earns his commission, unless the contract [between the broker and seller] contains a stipulation to the contrary, when a [buyer] and the [seller] enter into a valid and binding contract for the sale . . . of [the] lands.[47]

---

[46] Wauwatosa Realty Co. v. Paar, 274 Wis. 7, 13-15, 15-16, 79 N.W.2d 125 (1956) (quoting Restatement (First) of Agency § 445 (1933)).

[47] Kruger v. Wesner, 274 Wis. 40, 44, 79 N.W.2d 354 (1956). Kruger followed the reasoning of the Oregon Supreme Court in Oregon Home Builders v. Montgomery Investment Co., 184 P. 487, 492 (1919), which held as follows:

> [T]he literally overwhelming weight of authority is that, unless the [seller] and broker have stipulated to the contrary, the broker has fully earned his commission when the [buyer] and [seller] enter into a valid and binding contract for the sale or exchange of lands, and the broker's right to recover a commission is not, in the absence of bad faith upon his part, defeated or even affected by the fact that it

(continued)

¶88 Subsequent cases have repeated the rule set forth in Wauwatosa Realty and Kruger.[48]

¶89 With this precedent in mind, a commentator has written that it is settled law in Wisconsin "that if the buyer's valid written offer is accepted so as to constitute an enforceable contract, then the owner must pay [the] commission even if the buyer later defaults."[49]

¶90 The result in the instant case comports with precedent.

¶91 In sum, Ash Park's counterarguments do not persuade us to depart from the ordinary and legal meaning of the phrase "enforceable contract" in the listing contract between Ash Park and Re/Max. Under the listing contract, a contract is "enforceable" if a remedy is available for a breach. Thus, to determine whether the purchase contract between Ash Park and Alexander & Bishop is an "enforceable contract," we need determine only whether a remedy is available for a breach.

---

subsequently develops that the [buyer] is unable to complete his contract to buy on account of financial inability or is unable to complete the contract to exchange on account of inability to transfer a merchantable title.

[48] See, e.g., Mansfield v. Smith, 88 Wis. 2d 575, 585-87, 277 N.W.2d 740 (1979); Winston v. Minkin, 63 Wis. 2d 46, 52, 216 N.W.2d 38 (1974). See also Hercules v. Robedeaux, Inc., 110 Wis. 2d 369, 374-76, 329 N.W.2d 240 (Ct. App. 1982).

[49] Minter & Conrad, supra note 45, at 5-19.

¶92 A remedy is indisputably available for a breach of the purchase contract between Ash Park and Alexander & Bishop. Indeed, Ash Park has already obtained the remedy of specific performance for Alexander & Bishop's breach.

¶93 In response to the sole issue presented for our review, we therefore conclude that the purchase contract between Ash Park and Alexander & Bishop constitutes an "enforceable contract" within the meaning of the listing contract between Ash Park and Re/Max. Re/Max is entitled to a broker's commission from Ash Park even though Alexander & Bishop breached the purchase contract and the sale was never consummated.

¶94 Accordingly, we affirm the decision of the court of appeals. The cause is remanded to the circuit court for entry of summary judgment in favor of Re/Max; for a determination and award of Re/Max's prejudgment interest, costs, and attorney's fees; and for a determination of whether Re/Max's broker lien should be reinstated.

*By the Court.*—The decision of the court of appeals is affirmed.

¶95 DAVID T. PROSSER, J., did not participate.

¶96 PATIENCE DRAKE ROGGENSACK, C.J. *(concurring).* The majority opinion sets the question upon which Re/Max Select, LLC's entitlement to a broker's commission turns as: "whether the purchase contract between Ash Park and Alexander & Bishop constitutes an 'enforceable contract' within the meaning of the listing contract."[1] I would phrase the question to be decided as follows: whether the listing contract between Re/Max and Ash Park, LLC, two sophisticated business entities, demonstrates that they agreed that closing on a sale of the listed property was not required before the right to a realtor's commission arose. I answer that question, "yes." However, because I have grave concerns about the majority opinion being erroneously employed to shift the burden to investigate the financial ability of a proposed purchaser from the broker to an unsophisticated seller, I write in concurrence to the majority opinion.

### I. BACKGROUND

¶97 The majority opinion fully sets out the facts that underlie the dispute before us. Therefore, I will not repeat them.

### II. DISCUSSION

### A. Standard of Review

¶98 This review centers on interpreting and applying a single party listing contract for the sale of vacant land. Interpretation of a written contract is a question of law that

---

[1] Majority op., ¶32.

we review independently of the court of appeals and the circuit court while benefitting from their discussions. Anthony Gagliano & Co. v. Openfirst, LLC, 2014 WI 65, ¶32, 355 Wis. 2d 258, 850 N.W.2d 845.

### B.   Listing Contract Principles

¶99 There are two lines of cases that run on somewhat parallel, but different, tracks when the right to a commission is alleged to arise out of a real estate listing contract. One line of cases conditions the right to a commission on the broker procuring a purchaser who is "ready, willing, and able to purchase upon the terms specified by the owner in the brokerage contract." Grinde v. Chipman, 175 Wis. 376, 377, 185 N.W. 288 (1921). "Able" includes the purchaser's "financial ability to proceed." Peter M. Chalik & Assocs. v. Hermes, 56 Wis. 2d 151, 160, 201 N.W.2d 514 (1972). We have reasoned that:

> Generally speaking, a purchaser is financially ready and able to buy: (1) If he has the needed cash in hand, or (2) if he is personally possessed of assets——which in part may consist of the property to be purchased——and a credit rating which enable him with reasonable certainty to command the requisite funds at the required time, or (3) if he has definitely arranged to raise the necessary money——or as much thereof as he is unable to supply personally—— by obtaining a binding commitment for a loan to him for that purpose by a financially able third party, irrespective of whether such loan be secured in part by the property to be purchased.

Id. at 162 (internal quotation marks and citation omitted).

¶100 Therefore, not just any purchaser who signs an offer to purchase on terms acceptable to the seller will fulfill the criteria necessary for a broker to earn a commission. Stated

2

otherwise, when a purchaser is unable to perform financially, the seller has a defense to payment of a commission. <u>Id.</u> at 162-63.

¶101 The other line of cases is cited in the majority opinion. Those cases generally conclude that the right to a commission turns on whether the realtor provided a party who entered into a binding contract to purchase the real estate. For example, in <u>Wauwatosa Realty Co. v. Paar</u>, 274 Wis. 7, 79 N.W.2d 125 (1956), we upheld the right to a commission for the broker even though the sale of the real estate never closed. We reasoned that:

> The right of a broker to compensation accrues on completion of negotiations and on a meeting of the minds of the principal and the customer procured by the broker; but, unless provided otherwise in the contract of employment, it is not dependent on the final consummation of the transaction or the performance of the agreement entered into between the principal and the customer.

<u>Id.</u> at 14-15.

¶102 The above quote from <u>Wauwatosa Realty</u> is interesting because we began our discussion in <u>Wauwatosa Realty</u> by saying that, "[t]he question involved on this appeal is whether the plaintiff real-estate broker procured a purchaser ready, willing, and able to purchase the defendants' real estate pursuant to the terms of its listing contract so as to entitle the plaintiff to a broker's commission." <u>Id.</u> at 10. However, we never assessed whether the purchaser had the financial ability to complete the purchase contract.

3

¶103 In <u>Kruger v. Wesner</u>, 274 Wis. 40, 79 N.W.2d 354 (1956), where no sale occurred, we concluded that the realtor was due a commission, and we opined that:

> It may be generally stated that when a real-estate broker procures a purchaser who is accepted by the owner, and a valid contract is drawn up between them, the commission for finding such purchaser is earned, although the purchaser later defaults for no known reason . . .; or because the purchaser deliberately refuses to consummate the contract . . .; or <u>because of financial inability of purchaser to comply with the contract.</u>

<u>Id.</u> at 44 (emphasis added).

¶104 The emphasized part of the above quote is a significant departure from the line of cases that requires a purchaser to be financially "able" to complete the sale before a commission is due the broker. <u>See, e.g.</u>, <u>Chalik</u>, 56 Wis. 2d at 163. Yet, in <u>Kruger</u>, we gave no indication that we were intent on changing prior law. Rather, <u>Kruger</u> appears to be an extension of <u>Wauwatosa Realty</u> upon which <u>Kruger</u> says that it relies.[2] <u>Kruger</u>, 274 Wis. at 44.

¶105 In <u>Winston v. Minkin</u>, 63 Wis. 2d 46, 216 N.W.2d 38 (1974), we set out the dispositive issue as, "[w]hether the plaintiff procured a buyer ready, willing and able to purchase upon the terms specified by the owner in the listing contract or acceptable to him." <u>Id.</u> at 49. However, once again, notwithstanding our statement of the issue, we reasoned that

---

[2] I note that Justice Steinle wrote both the opinion in <u>Wauwatosa Realty Co. v. Paar</u>, 274 Wis. 7, 79 N.W.2d 125 (1956) and the opinion in <u>Kruger v. Wesner</u>, 274 Wis. 40, 79 N.W.2d 354 (1956).

4

"when a real estate broker procures a purchaser and a valid and enforceable contract is entered into between them the commission for procuring a purchaser is earned, even though the purchaser may later default." Id. at 51. Accordingly, we followed the change noted above in Kruger, even though we continued to give lip service to the "ready, willing and able" language of the earlier cases. Stated otherwise, Winston continued to shift the responsibility to investigate the financial ability of the proposed purchaser from the broker to the seller.

¶106 Why did we make this change? It appears that in Kruger, we concluded that the seller had a "reasonable opportunity to investigate" the purchaser's financial ability to proceed, and if the seller needed additional assurances of the purchaser being "able" to close on the sale, it was the seller's obligation to obtain whatever assurances he needed before entering into a binding contract with him. See Kruger, 274 Wis. at 45.

¶107 Imposing the responsibility to investigate the financial ability of a proposed purchaser onto a sophisticated seller may have been a sufficient reason for this shift of responsibility from the broker to the seller. However, I have grave doubts that this shift in responsibility is fair to the unsophisticated seller of real estate, who signs a standard form listing contract believing he or she will pay any commission due under the listing contract from the proceeds of a sale that the broker facilitates.

5

C. Re/Max-Ash Park Listing Contract

¶108 Re/Max's claim comes from the listing contract that Ash Park signed. In regard to Re/Max's right to a commission, the listing contract provides in relevant part:

COMMISSION: Seller shall pay Broker's commission, which shall be earned if, during the term of this Listing:

1) Seller sells or accepts an offer which creates an enforceable contract for the sale of all or any part of the Property;

. . . .

5) A purchaser is procured for the Property by Broker, by Seller, or by any other person, at the price and on substantially the same terms set forth in this Listing and in the standard provisions of the current WB-13 VACANT LAND OFFER TO PURCHASE, even if Seller does not accept this purchaser's offer.

. . . .

PROCURE: A purchaser is procured when a valid and binding contract of sale is entered into between the Seller and the purchaser or when a ready, willing and able purchaser submits a written offer at the price and on substantially the terms specified in this Listing. A purchaser is ready, willing and able when the purchaser submitting the written offer has the ability to complete the purchaser's obligations under the written offer.

(emphasis added).

¶109 Re/Max asserts that pursuant to the listing contract, the Ash Park—Alexander & Bishop contract is an enforceable contract entitling it to a commission under conditions 1 and 5 above, and that it has "procured" a purchaser because Ash Park and Alexander & Bishop entered into a binding contract for the purchase of the listed real estate. The listing contract's

6

definition of "procuring," which includes providing a purchaser who is "ready, willing and able" to complete the sale is an alternative to, not an addition to, entering into an enforceable contract. Therefore, under the listing contract, the right to a commission ripens when an enforceable contract is entered into, even if the purchaser is financially unable to complete the purchase. In sum, the listing contract sets a condition for earning a commission as follows: whether Ash Park and Alexander & Bishop entered into an enforceable contract.

¶110 By our decision affirming an order of specific performance of the Ash Park-Alexander & Bishop sales contract, we previously concluded that their contract is an enforceable contract. Ash Park, LLC v. Alexander & Bishop, Ltd., 2010 WI 44, ¶96, 324 Wis. 2d 703, 783 N.W.2d 294. Accordingly, I have no trouble concluding that the same contract remains "enforceable" when we are interpreting the listing contract. However, I have concerns about having the enforceability of the purchase contract be the end of our discussion.

¶111 Those concerns arise here because of the circuit court's finding that Alexander & Bishop was financially unable

7

to perform,[3] and because of representations that Ash Park settled its lawsuit against Alexander & Bishop because of Alexander & Bishop's insolvency.[4] However, of greater concern to me is the unsophisticated seller of real estate who may not understand the import of the provisions of the WB-13 listing contract as it affects his or her obligation to pay a real estate commission.

¶112 Here, Ash Park is a sophisticated business entity, represented by able counsel, with the ability and knowledge needed to investigate the financial wherewithal of Alexander & Bishop or to request modification of a listing contract to require closing on a sale before the right to a commission arises. That weighs in favor of affirming the court of appeals.

---

[3] "The reality of it is the realtor brought to these sellers a buyer who couldn't afford to buy the property. And in the end it was the buyer's inability to be able to buy the property, he couldn't get financing for it, he didn't have enough money in a bank account, he didn't have a deep enough pocket to go to, he couldn't do it."

Transcript of Motion Hearing at 14, Ash Park, LLC v. Alexander & Bishop, Ltd., No. 07CV2832 (Brown Cnty. Cir. Ct., June 13, 2011).

[4] Alexander & Bishop represented: "Ash Park and its principal is aware that Alexander & Bishop has no liquid assets in which to specifically perform——that is why it accepted the settlement agreement which called for a $1.2 million dollar payment to be made by the way of a loan. [] It also received numerous letters from Banks demonstrating that they would not be willing to loan money to Alexander & Bishop to buy the property."

Brief in Opposition of Motions for Contempt and Appointment of a Receiver and in Support of Motion to Enforce Settlement Agreement at 6-7, Ash Park, LLC v. Alexander & Bishop, Ltd., No. 07CV2832 (Brown Cnty. Cir. Ct., Feb. 14, 2011).

¶113 However, because I have concerns for the residential homeowner who lists his or her property using a standard form listing contract, without the aid of an attorney, and is unaware that he or she may be incurring an obligation to pay a commission when no sale occurs, I write in concurrence to draw attention to the potential hardship our decision is capable of producing if it is erroneously applied in a different context to an unsophisticated seller of real estate.

### III.  CONCLUSION

¶114 Because the question to be decided occurs in the context of a listing contract between two sophisticated business entities, Re/Max and Ash Park, I conclude that the listing contract demonstrates that they agreed that closing on a sale of the listed property was not required before the right to a realtor's commission arose.  However, I have grave concerns about the majority opinion being erroneously employed to shift the burden to investigate the financial ability of a proposed purchaser from the broker to an unsophisticated seller. Therefore, I write in concurrence to the majority opinion.