In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2036

THOMAS MERVYN, on behalf of
himself and all others similarly
situated,

*Plaintiff-Appellant*,

*v.*

ATLAS VAN LINES, INCORPORATED,
*et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 13 C 3587 — **Ronald A. Guzmán**, *Judge.*

ARGUED DECEMBER 7, 2017 — DECIDED FEBRUARY 14, 2018

Before BAUER, MANION, and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* Atlas Van Lines ("Atlas"), an autho-
rized interstate transporter of household goods, contracts with
agents to perform its shipments. One of its many agents, Ace

World Wide Moving, Inc.[1] ("Ace"), leases trucks and driving services from owner-operators. In 2009, owner-operator Thomas Mervyn entered into a lease agreement with Ace to haul shipments for Atlas. Mervyn brought a lawsuit in 2013 against Atlas and Ace alleging breach of contract and violations of the federal Truth-In-Leasing regulations under 49 C.F.R. § 376.12(d). Atlas and Ace moved for summary judgment and the district court granted it in their favor. We affirm.

## I. BACKGROUND

### A. Regulatory Background

The Motor Carrier Act authorizes the Department of Transportation to regulate "carriers," including trucking companies, which transport goods interstate. 49 U.S.C. § 14104(a). Often carriers contract with "hauling agents" to transport the goods. In turn, the hauling agent may contract with an individual truck owner, an "owner-operator," who leases his truck and services to the agent and carrier. Owner-operators may bring civil actions against carriers or agents for

---

[1] This entity, Ace World Wide Moving, Inc., is distinct from the named defendant, Ace World Wide Moving & Storage Co., Inc. The defendants notified Mervyn in the district court that he had contracted with Ace World Wide Moving, Inc., and named the wrong defendant in his complaint. However, Mervyn never amended his complaint. The district court granted summary judgment on behalf of the incorrectly named entity, Ace World Wide Moving & Storage Co., Inc., because it was not a party to the relevant dispute. Nevertheless, the district court on summary judgment addressed the merits with respect to the lease agreement between Mervyn and Ace World Wide Moving, Inc.

violations of legal rights established under the statute or regulations. *See* 49 U.S.C. § 14704(a)(2).

The lease agreements between owner-operators and the agent or carrier are governed by the Truth-In-Leasing regulations. 49 C.F.R. § 376.1. The regulations require that the lease be in writing and contain specific provisions. *See* 49 C.F.R. § 376.11; 49 C.F.R. § 376.12. Relevant to this dispute, "[t]he amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease." 49 C.F.R. § 376.12(d). That amount "may be expressed as a percentage of gross revenue, a flat rate per mile … or by any other method of compensation mutually agreed upon by the parties to the lease." *Id.*

### B. Atlas' and Ace's Contract with Mervyn

Atlas is an agent-owned company, and Ace is one of its many agents. Generally, when a customer contracts with Atlas for a shipment, Atlas passes the job onto a hauling agent, like Ace, who in turn contracts out the driving portion of the job to an owner-operator. Mervyn is an independent owner-operator who leased his trucks and driving services to Ace.

Federal law requires carriers like Atlas to publish tariffs showing the rates for each task in the shipment of household goods. 49 U.S.C. § 13702(b)(1). One of the tariff rates is for "linehaul," which is based on the weight of the goods and the distance they are shipped. These rates are only ceilings of what Atlas may charge a customer in a given shipment, and Atlas often negotiates discounts of the tariff rates with its customers in order to secure their business. After the shipment is com-

plete, Atlas collects payment from the customer and distributes the revenue to its agents. An agent is entitled to revenue based on the services it performed. Thus, a hauling agent like Ace is entitled to receive a portion of the linehaul revenue. If the hauling agent used an owner-operator in the shipment, the hauling agent pays the owner-operator according to the terms of their lease agreement.

According to Atlas, because it needed a way to distribute the costs of providing customer discounts across the various agents involved in a shipment, it instituted the "effective bottom line discount" ("EBLD"). Atlas also used the "predetermined effective bottom line discount" which is an estimate of what the EBLD will be over a series of shipments. Under these policies, Atlas divides the total value of the discounts provided to the customer, including services it provided for free, by the total maximum value of that shipment using the tariff rates. The resulting percentage is the EBLD. Atlas then applies that EBLD percentage to the tariff charges to determine how much an agent will receive.

Mervyn entered into a lease agreement with Ace on February 1, 2009. The lease specified that Wisconsin state law would govern. As relevant here, under the "Payments to Contractor" section of the lease, Mervyn was to "earn compensation as provided in the schedule of compensation included in Schedule B." Mervyn hauled interstate shipments of household goods which were governed by Schedule B-1. The top of Schedule B-1 listed numerous "definitions and general rules" for determining Mervyn's compensation. Atlas did not instruct Ace how to compensate its owner-operators, but the lease agreement adopted Atlas' EBLD method for the linehaul

charge: "Linehaul and accessorial service charges shall be determined by applying the applicable effective or predetermined effective bottom line discount (determined under Atlas' rules) to the transportation and accessorial charges for each shipment." The bottom of Schedule B-1 included percentages to be paid out for certain categories of service. For the linehaul charge, the lease read "Linehaul 58%."

The bottom of Schedule B-1 also specified that Mervyn was to receive 100% of the fuel surcharge ("Fuel Surcharge 100%"). Atlas would often negotiate with its customers a discount from the tariff rate for the fuel surcharge, but during Mervyn's lease with Ace, whatever amount the customer paid to Atlas in fuel surcharge was paid in full to Ace, and in turn, paid in full to Mervyn.

Atlas and Ace maintained financial documentation for individual shipments in a computer system called the Rating Invoice and Distribution System ("RTDS"). Mervyn received documentation from Ace displaying two different screens: (1) the amounts billed to the customer; and (2) the amounts distributable to him after applying the EBLD. Mervyn also received a "Settlement Sheet" displaying his compensation for each of the services he provided.

An example of a shipment Mervyn completed for Ace under the lease illustrates how Mervyn was compensated. Mervyn's RTDS screen for the "Evans Shipment" showed that the customer was billed $7,416.79 for the linehaul charge, a 60% discount from the tariff rate of $18,541.98. Atlas also subtracted certain items from the invoice amount that were offered to the customer at a 100% discount, such as $258.00 for

full value protection services, $52.03 for hauling bulky articles, and $166.31 for a booking rebate. After applying the EBLD percentage, the linehaul charge was reduced to $6,652.29 in distributional charges to Mervyn. Since Schedule B-1 of the lease stated that Mervyn was to receive 58% of the linehaul charge, he received 58% of $6,652.29, or $3,858.33. For the fuel surcharge, the tariff rate of $2,039.61 was billed to the customer at a 60% discount, or $815.84. Mervyn received 100% of the fuel surcharge the customer paid. All of these figures in the Evans Shipment were produced to Mervyn in the Settlement Sheet and the RTDS Screen.

Critically, Paragraph 11(f) under the "Payments to Contractor" section of the lease specified that the financial entries made by Ace on the payment documents "shall be conclusively presumed correct and final if not disputed by [Mervyn] within 30 days after distribution." Although Mervyn had made prior complaints regarding certain financial entries in the payment documents, he never took any action with respect to the linehaul and fuel surcharge financial entries during the 2009 lease with Ace until the filing of this lawsuit.

## C. Procedural History

Mervyn brought a purported class action lawsuit in the Northern District of Illinois against Atlas and Ace on May 14, 2013. He alleged state law breach of contract, claiming that he was not fully compensated according to the plain terms of the lease; as well as violations of the Truth-In-Leasing regulations under 49 C.F.R. § 376.12(d), claiming that his compensation for the linehaul and fuel surcharge were not "clearly stated" in the lease. The case was assigned to Judge Ronald J. Guzmán.

Mervyn had brought a purported class action suit in 2011 raising virtually identical claims against Atlas and another one of its agents. That case was filed in the Northern District of Illinois and assigned to Judge Gary Feinerman. Before a class was certified, Judge Feinerman granted a motion for summary judgment in favor of the defendants on March 31, 2016. *See Mervyn v. Nelson Westerberg, Inc.*, No. 11 C 6594, 2016 WL 1270416 (N.D. Ill. Mar. 31, 2016).

Shortly after Judge Feinerman issued his opinion, Judge Guzmán suspended briefing on class certification and ordered briefing on Atlas' and Ace's motion for summary judgment. On April 20, 2017, Judge Guzmán granted summary judgment in favor of Atlas and Ace.

The district court held that Mervyn's failure to comply with Paragraph 11(f) barred the breach of contract claims. Because the financial entries are presumed correct if not disputed within 30 days according to the lease, Mervyn could not challenge their accuracy. Moreover, the court found that even if Paragraph 11(f) did not bar Mervyn's breach of contract claims, they still would fail because Mervyn was paid according to the terms of the lease agreement. The court also ruled that the claims under the Truth-In-Leasing regulations failed since they were based on the breach of contract claims.

## II. DISCUSSION

We review a district court's grant of summary judgment *de novo*, and construe all factual disputes and reasonable inferences in favor of the non-moving party. *Betco Corp. v. Peacock*, 876 F.3d 306, 309 (7th Cir. 2017). Summary judgment is appropriate if the moving party has shown there is "no

genuine dispute as to any material fact," and is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a).

Mervyn advances two claims that are necessarily inconsistent: that he was not paid according to the plain terms of the lease; and that the lease violated the Truth-In-Leasing regulations because the terms were not "clearly stated." According to Mervyn, he was not paid according to the lease because Atlas' and Ace's application of the EBLD reduced his compensation for the linehaul charge. Under this theory, he should have been paid 58% of what was billed to the customer, not 58% of that amount after applying the EBLD. For the fuel surcharge, Mervyn argues that he was owed 100% of the tariff rate, not 100% of what the customer ultimately paid. Since these claims regarding his compensation are governed by his lease agreement with Ace, they are simply breach of contract claims. That is where we focus our analysis.

The parties agree Wisconsin law governs the breach of contract claims. "The primary goal in contract interpretation is to give effect to the parties' intentions." *Seitzinger v. Cmty. Health Network*, 676 N.W.2d 426, 433 (Wis. 2004). Contracts are construed according to their plain and ordinary meaning. *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 866 N.W.2d 679, 685 (Wis. 2015). "Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms." *Maryland Arms Ltd. v. Connell*, 786 N.W.2d 15, 20–21 (Wis. 2010) (quoting *Gorton v. Hostak, Henzl & Bichler, S.C.*, 577 N.W.2d 617, 623 (Wis. 1998)).

The plain and ordinary meaning of Paragraph 11(f) is very clear. The first sentence states: "Financial entries made by [Ace]

on payment documents shall be conclusively presumed correct if not disputed by [Mervyn] within 30 days after distribution." This plainly means that if Mervyn did not dispute the financial entries within 30 days, he could not later argue that the entries incorrectly reflect what he was owed. Mervyn admits that he never disputed the financial entries he now complains of—the linehaul charge and fuel surcharge—until he filed this lawsuit in 2013.

Moreover, it is undisputed that Mervyn received RTDS screens and Settlement Sheets that clearly displayed the financial entries reflecting what was billed to the customer and his compensation. Those entries showed that Mervyn would receive 58% of the linehaul charge after applying the EBLD, not 58% of what was billed to the customer. Additionally, the entries reflected that Mervyn would receive 100% of the fuel surcharge that the customer paid, not 100% of the tariff rate. Mervyn cannot escape the plain and ordinary meaning of Paragraph 11(f)'s 30-day window to dispute the financial entries by filing a lawsuit four years later challenging the accuracy of those entries. Accordingly, Paragraph 11(f) bars Mervyn's breach of contract claims that the financial entries for the linehaul and fuel surcharge were less than what he was owed under the lease.

In an effort to escape the plain and ordinary meaning of Paragraph 11(f), Mervyn tries to reinterpret the lease's language in a number of ways. None of these arguments change our ultimate conclusion. First, Mervyn argues that we cannot ignore the second sentence in Paragraph 11(f), which states that "[o]n the date 30 days after distribution, such documents shall constitute the primary and/or prima facie business record

between [Ace] and [Mervyn] with respect to the financial transactions between the parties … ." He posits that his failure to timely object to the entries only created prima facie evidence of the entries, which by definition, can be rebutted.

However, interpreting Paragraph 11(f) to only create a rebuttable presumption of the accuracy of the financial entries would require us to completely ignore the first sentence stating that if the entries are not disputed within 30 days, they "shall be conclusively presumed correct." Something that is conclusively presumed correct cannot be rebutted. Nor are the two sentences irreconcilable. The first sentence of Paragraph 11(f) establishes that the *entries* on the documents are conclusively presumed correct if not disputed in 30 days. The second sentence states that after 30 days, the *documents* with the entries are primary and/or prima facie evidence of a *transaction*. In other words, Mervyn could file a lawsuit saying he was never paid under the lease, and the financial documents would only establish prima facie evidence that he was paid, which could be rebutted.

Mervyn also points to other parts of the lease to suggest that the documentation he received was not intended to reflect what he was owed, but merely what he was paid into his operating account. Under this line of thinking, Paragraph 11(f) only required Mervyn to dispute within 30 days whether he was actually paid into his operating account the amounts reflected in the financial entries. Again, this argument does not square with the plain and ordinary meaning of Paragraph 11(f), which does not contain the words "operating account."

Finally, Mervyn argues that Paragraph 11(f)'s 30-day window to dispute the financial entries is unreasonably short and unenforceable. Mervyn cites to an unpublished district court opinion which found an owner-operator lease provision unenforceable that barred "*any claim or demand of any nature*" from being brought if no written notice was provided in 90 days. *See Al-Anazi v. Bill Thompson Transp., Inc.*, No. 15-CV-12928, 2016 WL 3611886, at *5–7 (E.D. Mich. July 6, 2016) (emphasis added). However, as the district court here noted, Paragraph 11(f) is not a claims limitations clause. In other words, it does not bar Mervyn from bringing *any claims* arising out of his compensation; rather, it simply establishes the accuracy of the financial entries if they are not disputed within 30 days. As noted above, Paragraph 11(f) does not prohibit Mervyn from bringing claims challenging whether he was paid under the lease. The record below reflected that Mervyn had enough time to raise disputes over the entries, and in fact, had raised disputes to other types of entries with respect to his compensation. Thus, Paragraph 11(f) is not unreasonably short or unenforceable.

Regardless of whether Paragraph 11(f) bars Mervyn's breach of contract claims, the claims fail on the merits because Mervyn was compensated according to the plain and ordinary terms of the lease. As for Mervyn's argument that he was not fully compensated for the linehaul charge, the lease specifically states that "Linehaul and accessorial service charges shall be determined by applying [the EBLD] (determined under Atlas' rules)." Application of the EBLD was explicitly contemplated in the lease, and Ace paid him accordingly: 58% of what was billed to the customer after applying the EBLD. Mervyn cannot

simply point to "Linehaul 58%" in Schedule B-1 and ignore the plain language directly above it stating that the EBLD, determined by Atlas' rules, would be applied to the linehaul charge. It is undisputed that Mervyn was paid 100% of the fuel surcharge that the customer paid to Atlas, and in turn, to Ace. Mervyn argues that he was entitled to 100% of the tariff rate, which was not charged to the customer. But there is nothing in the lease, or in Schedule B-1, that would allow for such an interpretation. The plain language of Schedule B-1 only states, as it relates to fuel surcharge, "Fuel Surcharge 100%." That is precisely what Mervyn received: 100% of what the customer paid for the fuel surcharge.

Finally, the district court did not err in granting summary judgment to Atlas and Ace on Mervyn's claims under the Truth-In-Leasing regulations. Mervyn's arguments in the district court and on appeal for these claims were necessarily premised on a breach of the lease. Since we conclude that Mervyn's breach of contract claims fail and that he was paid according to the plain terms of the lease, his claims under the Truth-In-Leasing regulations also fail.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of Atlas and Ace.