**2024 WI App 24**

# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.: 2023AP778

Complete Title of Case:

RIPP DISTRIBUTING COMPANY, INC.,

PLAINTIFF-RESPONDENT,

V.

RUBY DISTRIBUTION LLC AND BRIAN ELDER,

DEFENDANTS-APPELLANTS.

| | |
|---|---|
| Opinion Filed: | March 21, 2024 |
| Submitted on Briefs: | September 14, 2023 |

| | |
|---|---|
| JUDGES: | Kloppenburg, P.J., Graham, and Nashold, JJ. |

Appellant
ATTORNEYS: On behalf of the defendants-appellants, the cause was submitted on the briefs of *Jeffrey A. Mandell* and *Isaac S. Brodkey* of *Stafford Rosenbaum LLP*, Madison.

Respondent
ATTORNEYS: On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Kara M. Burgos* of *Moen Sheehan Meyer, Ltd*., La Crosse.

Amicus
ATTORNEYS: A nonparty brief was filed by *Jacob S. Margolies* of *Dentons Bingham Greenebaum LLP*, Louisville, Kentucky, for Professor Yaron Nili.

COURT OF APPEALS
DECISION
DATED AND FILED

March 21, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      2023AP778

STATE OF WISCONSIN

Cir. Ct. No.  2021CV624

IN COURT OF APPEALS

RIPP DISTRIBUTING COMPANY, INC.,

    PLAINTIFF-RESPONDENT,

  V.

RUBY DISTRIBUTION LLC AND BRIAN ELDER,

    DEFENDANTS-APPELLANTS.

---

APPEAL from an order of the circuit court for La Crosse County: GLORIA L. DOYLE, Judge. *Reversed and cause remanded with directions*.

Before Kloppenburg, P.J., Graham, and Nashold, JJ.

¶1 GRAHAM, J.  This case arises from the sale of the assets of Ruby Distribution LLC's water distribution business to Ripp Distributing Company,

LLC. Prior to the sale, the parties executed an asset purchase agreement (the "APA"), in which Ruby and its sole member, Brian Elder,[1] made various representations and warranties about the assets as of the effective date of the APA and the date the asset sale would close. As part of the APA, the parties agreed to a survival clause, which provided that Ruby's representations and warranties "shall survive the Closing for a period of one year from the Closing Date."

¶2 After the sale closed and Ripp took possession of the assets, it allegedly discovered operational issues and, 18 months after the closing, it filed this lawsuit, which asserts contract and tort claims based on the allegedly false representations and warranties that Ruby made in the APA. Ruby filed a motion for judgment on the pleadings, arguing that the contract claims should be dismissed based on the one-year limitations period in the survival clause, and that the tortious misrepresentation claims should be dismissed based on the economic loss doctrine. The circuit court denied the motion.

¶3 On interlocutory appeal, we conclude that Ruby is entitled to judgment on the pleadings. Ripp's contract claims are time barred under the APA's survival clause, which can only be reasonably interpreted as a contractual limitations period for commencing a lawsuit for breach of the representations and warranties. Turning to Ripp's tortious misrepresentation claims, they are barred by the economic loss doctrine. Therefore, we reverse and remand for the entry of an order dismissing Ripp's complaint.

---

[1] We refer to Ruby and Elder collectively as "Ruby" throughout the remainder of the opinion, except when the syntax of the APA requires that we separately reference the parties.

## BACKGROUND

¶4    The following facts and allegations are derived from Ripp's complaint, and Ruby's answer, as well as the APA and closing documents that were attached to the complaint, which are properly considered when evaluating Ruby's motion for judgment on the pleadings.

¶5    Prior to the sale that is the subject of this lawsuit, Ruby owned and operated a water distribution business. On May 6, 2020, Ruby and Ripp entered into the APA, in which Ruby agreed to sell and Ripp agreed to purchase substantially all of the assets of the business, including but not limited to equipment, inventory, accounts receivable, intangible assets, and customer contracts, records, and relationships. According to the APA, the closing date was to take place on or before June 15, 2020.

¶6    As part of the APA, Ruby made various representations and warranties, all of which are found in Section 7. We now summarize those representations and warranties that pertain to the allegations in Ripp's complaint:

- With regard to its operation of the business through the closing date, Ruby represented and warranted that, "[s]ince the Effective Date[2] of this Agreement and through the Closing Date," Ruby had and would continue "to conduct the Business in the ordinary course of business."[3]

_____

[2] The APA defined the "Effective Date" as May 6, 2020, the day that the parties executed the APA.

[3] The APA also included a covenant with similar but not identical language about Ruby's conduct between the effective date of the APA and the closing date. Ripp does not make any separate argument about this covenant, and we discuss it no further.

- With regard to the "Purchased Assets," Ruby represented and warranted that it owned and had transferable title to the assets; that the equipment[4] and other tangible personal property would be sold and accepted by Ripp "AS IS, WHERE IS" in its "then present condition" at closing; and that accounts receivable would be sold "AS IS," "without any representation or warranty as to collectability, aging, or quality."

- As for its "Contracts," Ruby represented and warranted that it had "provided [Ripp] with a list of all customer accounts, contracts and other agreements, whether written or oral" that related to the assets that Ripp was purchasing; and that Ruby had delivered to Ripp "a correct and complete copy of each written agreement listed (as amended to date) and a written summary setting forth the basic terms and conditions of each oral agreement." Ruby further warranted that, to its knowledge: all of the agreements were "legal, valid, binding, enforceable and in full force and effect" and would "continue" to be so "on identical terms" after Ripp acquired the business; that Ruby was not in breach of any of the agreements "and no event has occurred that, with notice or lapse of time, would constitute a breach or default" by Ruby or would "permit termination, modification, or acceleration, under the agreement[s]"; and that "no party has repudiated any provision of the agreement[s]."

---

[4] The APA included a separate representation and warranty regarding bottling equipment, but we discuss it no further because Ripp does not make any allegation in the complaint about the bottling equipment.

- As for "Compliance with Law," Ruby represented and warranted that, to its knowledge, the conduct of its business and its use of the purchased assets "d[id] not violate, nor [was Ruby] in default under, any law, regulation, rule, license, permit or order of any court or governmental commission."

- Finally, under the heading "Full Disclosure," Ruby represented and warranted that, to the best of its knowledge, "no warranty or representation by [Ruby] contained in this Agreement contains or will contain any untrue statement of material fact or omits or will omit to state any fact required to make the statements herein contained not misleading."

¶7　In a provision of the APA that we refer to as the "exclusivity of representations clause," the parties agreed that the representations and warranties in Section 7. were exclusive: "Except for the representations and warranties contained in this Section 7., neither [Ruby] nor Elder makes any other express or implied representation or warranties, either written or oral, on behalf of [Ruby], including any representation or warranty as to future revenues, profitability or success of the business."

¶8　Additionally, and importantly here, the APA also included the following clause, titled "Survival of Warranties": "The warranties and representations of [Ruby] shall survive the Closing for a period of one year from the Closing Date." Like the parties, we refer to this provision as the "survival

clause," and we refer to the one-year period contemplated by the survival clause as the "survival period."[5]

¶9      The APA explicitly provided that the truth of Ruby's representations and warranties, as well as Ruby's performance of certain covenants it made in the APA, were conditions precedent to Ripp's obligation to close the sale. To that end, Section 9.A. provided that Ripp's "obligation … to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction, on or before the Closing, of each and every one of the following conditions, all or any of which may be waived …:"

> (i) <u>Representations True at Closing</u>. The representations and warranties made by [Ruby] in this [APA] … shall be true and correct in all material respects on the Closing Date hereunder with the same force and effect as though such representations and warranties had been made on and as of the Closing Date ….

> (ii) <u>Covenants of Seller</u>. Seller shall have duly performed all of the covenants, acts, and undertakings to be performed by it on or prior to the Closing.

---

[5] Although the parties do not refer to the APA's indemnification provisions in their briefing, we observe that Section 13.A., titled "Seller's Indemnification," provided that Ruby would indemnify and hold Ripp harmless with respect to "any and all demands, claims, losses, costs, fines, liabilities, damages, … and expenses … resulting from, in connection with or arising out of" certain misrepresentations and breaches. Among other things, Ruby agreed to indemnify Ripp for "any materially incorrect representation or warranty" that Ruby made in the APA "or in any closing document delivered by [Ruby]," and also for Ruby's failure "to comply with, or the breach by [Ruby of] any of the covenants or undertakings" that Ruby made in the APA. The indemnification provision also included its own survival clause which provided: "The Indemnification provisions set forth in Section[] 13.A … shall survive the Closing for a period of one … year after the Closing Date."

The APA also included a section about termination, which allowed Ripp to terminate or abandon the sale "if the Conditions to Close set forth in Section 9.A. have not been met or waived on or before the closing."

¶10   Finally, the APA included a provision that is commonly referred to as an "integration clause,"[6] which provided that "[a]ll understandings and agreements … are merged in this Agreement, the exhibits and schedules attached hereto, which alone fully and completely express their agreement.   Any modifications to this Agreement must be evidenced by written agreement signed by both parties."

¶11   The parties closed the transaction on June 12, 2020, with Ruby executing and delivering a bill of sale that transferred all rights and interests in the purchased assets to Ripp on the terms provided in the APA.  At the closing, Ruby also executed a "Seller Closing Certificate," in which it certified that the representations and warranties that it made in the APA "were, when made, and are true, complete and correct as of the date of this Closing Certificate with the same force and effect as though the representations and warranties had been made again on the date of this Closing Certificate."  As part of the closing certificate, Ruby also certified that it had "performed and complied in all material respects with all of its covenants and obligations under the Agreement which are to be performed or complied with by it on or before Closing."

_____

[6] *See* ***Town Bank v. City Real Est. Dev., LLC***, 2010 WI 134, ¶39, 330 Wis. 2d 340, 793 N.W.2d 476 (discussing the definition and purpose of integration clauses).

¶12 Following the closing, Ripp took possession of the purchased assets and became the sole operator of the water distribution business. At some point after the closing, Ripp allegedly discovered operational issues with some of the assets it purchased, but it did not file this lawsuit until 18 months after the closing date.

¶13 In December 2021, Ripp filed its complaint, which alleges that Ripp discovered the following problems after closing: several of the delivery vehicles that Ripp purchased were not road worthy or safe, and all had been suspended by the state department of motor vehicles; some of the water coolers that Ripp purchased were not functioning properly; the "candy business that was supposed to be included with the sale was no longer operational"; Ruby "failed to disclose directives" from a state agency "to make costly improvements at the premise[s]"; Ruby "misrepresented" its number of customers; Ruby failed to cash customer payments, and failed to apply payments to their respective accounts, resulting in unaccounted for payments and customer loss; Ruby "failed to return 43 voicemails from customers" regarding various issues, "which caused further customer loss"; "[c]ritical customer and business contact information had not been properly transferred" to Ripp as contemplated under the APA; and "[Ruby] had not transferred ownership or access to … items[] including the business website, the company's bank accounts, and credit cards." According to Ripp, its allegations "indicate that [Ruby] simply stopped bothering to run the business properly and responsibly in the ordinary and usual course between the time [it] entered into the [APA] with [Ripp] and the date of closing." The complaint alleges that Ruby "knew or should have known about the problems with the business and[] its assets and willingly or negligently failed to disclose these problems."

¶14    Ripp's complaint asserts contract claims for breach of contract and breach of warranty. In the alternative, it asserts tort claims for intentional, strict responsibility, and negligent misrepresentation. The complaint seeks "damages resulting from [Ruby's] breach of contract and/or breach of warranty" or, alternatively, "for restitution for [Ruby's] misrepresentations."

¶15    In its answer, Ruby denies that it breached any aspect of the APA and further denies that it made any misrepresentations. Ruby also asserts several affirmative defenses. Among other things, Ruby alleges that Ripp's contract claims are premised on breaches of the representations and warranties that Ruby made in the APA and are therefore barred by the one-year contractual limitations period set forth in the APA's survival clause; that the exclusivity of representations clause together with the integration clause bar any claim premised on representations or warranties not contained in the APA; and that the misrepresentation claims are barred by the economic loss doctrine.

¶16    Ruby then moved for judgment on the pleadings, and Ripp opposed the motion. Following a hearing, the circuit court denied the motion. We granted Ruby's petition for leave to appeal the nonfinal order. *See* WIS. STAT. RULE 809.50.[7]

---

[7] In the appellate briefing, the parties cite to the appendix that was submitted with Ruby's brief without including parallel citations to the appellate record that was compiled by the clerk of the circuit court. We remind counsel that the appendix is not the record, *United Rentals, Inc. v. City of Madison*, 2007 WI App 131, ¶1 n.2, 302 Wis. 2d 245, 733 N.W.2d 322, and that the state rules of appellate procedure require parties to include appropriate citations to the record, *see* WIS. STAT. RULE 809.19(1)(d)-(e).

**DISCUSSION**

¶17　On appeal, we review de novo the circuit court's order denying Ruby's motion for judgment on the pleadings. ***Freedom from Religion Found., Inc. v. Thompson***, 164 Wis. 2d 736, 741, 476 N.W.2d 318 (Ct. App. 1991). "A judgment on the pleadings is essentially a summary judgment decision without the affidavits and other supporting documents." ***Southport Commons, LLC v. DOT***, 2021 WI 52, ¶18, 397 Wis. 2d 362, 960 N.W.2d 17. Judgment on the pleadings is properly granted if, based on the pleadings, no disputed issues of material fact remain to be resolved by a jury and one party is entitled to judgment as a matter of law. ***Tri City Nat'l Bank v. Federal Ins. Co.***, 2004 WI App 112, ¶34, 268 Wis. 2d 785, 674 N.W.2d 617 (2003).

¶18　Here, although the facts underlying Ripp's allegations are disputed, Ruby's motion for judgment on the pleadings is based on its affirmative defenses, and the parties do not dispute the facts that are material to those affirmative defenses. Therefore, our analysis turns on whether Ruby is entitled to judgment as a matter of law based on those affirmative defenses.

**I. The Contract Claims and the Survival Clause**

¶19　We begin with Ripp's contract claims. As noted, the complaint alleges that, following the closing, Ripp discovered various problems with the assets it purchased, all of which suggest that Ruby "breached the terms of the [APA]" and "its warranties under the [APA]." Ruby asserts that Ripp's contract claims are barred by the APA's survival clause because its lawsuit commenced more than a year after the closing date.

¶20     As discussed, the survival clause provided that Ruby's "warranties and representations … shall survive the Closing for a period of one year from the Closing Date." The parties disagree about the proper interpretation of this clause. Our resolution of this appeal ultimately turns on the parties' arguments about contract interpretation; however, before examining those arguments, we begin with a general discussion of the role that representations, warranties, and survival clauses play in complex business transactions between sophisticated parties.

## A. Representations, Warranties, and Survival Clauses

¶21     There are no Wisconsin cases that specifically address the survival of representations and warranties, or that interpret a survival clause in a purchase agreement. Even so, commentators and courts in other jurisdictions have examined these types of provisions, providing us with persuasive guidance.[8]

---

[8] *See, e.g.*, ***State St. Bank and Tr. Co. v. Denman Tire Corp.***, 240 F.3d 83, 87 (1st Cir. 2001); ***Eckert v. Titan Tire Corp.***, 514 F.3d 801, 805 (8th Cir. 2008). ***Western Filter Corp. v. Argan, Inc.***, 540 F.3d 947, 952, (9th Cir. 2008); ***Betco Corp. v. Peacock***, No. 14-CV-193-WMC, 2015 WL 856603 **12-13 (W.D. Wis. Feb. 27, 2015), *aff'd sub. nom.* ***Betco Corp., Ltd. v. Peacock***, 876 F.3d 306 (7th Cir. 2017); ***Pentair, Inc. v. Wisconsin Energy Corp.***, 545 F. Supp. 2d 917, 920-21 (D. Minn. 2008); ***Caddy Prods., Inc. v. Greystone Int'l, Inc.***, No. CIV 05-301, 2006WL2385149 **2-3 (D. Minn. Aug. 17, 2006); ***Latek v. LeaseAmerica Corp.***, No. 90 C 7230, 1992 WL 170546 **2-3 (N.D. Ill. July 16, 1992), *aff'd*, 7 F.3d 238 (7th Cir. 1993); ***Epic Energy LLC v. Encana Oil & Gas (USA) Inc.***, No. CIV 19-0131, 2019 WL 4303325 **4-5 (D.N.M. Sep. 11, 2019); ***GRT, Inc., v. Marathon GTF Tech., Ltd.***, No. CIV.A. 5571-CS, 2011 WL 2682898 **13-14 (Del. Ch. July 11, 2011); ***Town of Crossville Hous. Auth. v. Murphy***, 465 S.W.3d 574, 579 (Tenn. Ct. App. 2014). *See also* SAMUEL C. THOMPSON, JR., PRACTICING LAW INSTITUTE, MERGERS, ACQUISITIONS AND TENDER OFFERS § 2:14 (2011); 2 LOU R. KLING & EILEEN T. NUGENT, NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS § 15.02[2] (2023); ABA MODEL ASSET PURCHASE AGREEMENT (2001) § 11.1; 12A WILLIAM MEADE FLETCHER, FLETCHER CY. CORP. § 5615 (Sep. 2022 Update); Will Pugh, *Getting What You Bargained For: Avoiding Legal Uncertainty in Survival Clauses for a Seller's Representations and Warranties in M&A Purchase Agreements*, 12 J. Bus. Entrepreneurship & L. 1 (2019). We are not bound by any of these opinions or secondary sources, but we cite them here for their persuasive value.

(continued)

¶22 According to these authorities, purchase agreements often include express representations and warranties. *Town of Crossville Hous. Auth. v. Murphy*, 465 S.W.3d 574, 579 (Tenn. Ct. App. 2014). "Representations and warranties are statements of fact, as of the date of the execution of [a purchase] agreement," the truth of which generally serve as a condition precedent to closing the deal that is contemplated by the agreement. *Western Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 952 (9th Cir. 2008) (quoting SAMUEL C. THOMPSON, JR., BUSINESS PLANNING FOR MERGERS AND ACQUISITIONS, 780, Carolina Academic Press 2d ed. 2001 (1997)); *see also* 12A WILLIAM MEADE FLETCHER, FLETCHER CY. CORP. § 5615 (Rev. Vol. 2017) (addressing representations and warranties in a stock purchase agreement). The function of the representations and warranties is to "serve as a safety net for the seller and buyer"—"[i]f, prior to closing, either the seller or buyer discovers that a representation or warranty made by the other party is not true, they have grounds for backing out of the deal." *Western Filter Corp.*, 540 F.3d at 952 (citation omitted).

¶23 Commentators and courts debate whether, as a general matter, representations and warranties in an agreement "survive" the closing of a transaction such that they can form the basis for a postclosing cause of action for damages. *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. CIV.A. 5571-CS, 2011 WL 2682898 **13-15 (Del. Ch. July 11, 2011) (surveying authorities). Some authorities suggest "a hard and fast rule" that, "unless the parties agree to a survival clause" that extends the representations and warranties "past the closing

---

We also granted leave to file an amicus brief to Professor Yaron Nili of the University of Wisconsin Law School, and we thank him for the legal background and perspective he provided.

date," the representations and warranties function exclusively as a condition precedent to closing, and they expire upon closing. *Id.* (citing FLETCHER, *supra* § 5616). Under this approach, without a survival clause, a party that makes an untrue representation or warranty "cannot be sued for damages post-closing" based on "their later discovered breach." *Id.* (emphasis omitted).[9] Other commentators are more equivocal about the role that representations and warranties play following the closing. *See, e.g.*, 2 LOU R. KLING & EILEEN T. NUGENT, NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS § 15.02[2] at 15-20 (2023) ("The question of whether representations and warranties survive the close or are merged into the sale … is not settled."). Some suggest that, in the absence of a survival clause, a party that makes an untrue representation or warranty might be sued for that breach up through the otherwise applicable statute of limitations for contract claims.[10]

¶24 Accordingly, when an agreement is silent on the issue of survival of its representations and warranties, there can be uncertainty as to whether a party who has relied on untrue representations and warranties has any postclosing legal recourse. *GRT, Inc.*, No. CIV.A. 5571-CS, *13. To provide certainty, parties to an agreement can—and often do—negotiate contractual provisions that explicitly

---

[9] *See also* **Western Filter Corp.**, 540 F.3d at 952; **Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC**, C.A. No. 7701-VCL, 2015 WL 139731 *14 (Del. Ch. Jan. 12, 2015) ("Absent contract language providing to the contrary, pre-closing representations about the acquired property interest become ineffective post-closing ...."); ABA MODEL ASSET PURCHASE AGREEMENT (2001) § 11.1 cmt. at 214 ("[T]he seller's representations typically terminate at the closing and, thus, serve principally as information-gathering mechanisms, closing conditions and a basis for liability if the closing does not occur[.]").

[10] *See* Pugh, *supra* at 18 n.73 (citing Gregory Fine & Jessica Mendoza, *Survival of Reps and Warranties: Avoiding Unpleasant Surprises for Buyers* (May 16, 2014)).

address whether the representations and warranties survive the closing date. *Id.*, **13, 15. And, in those instances in which the parties agree that the representations and warranties will survive the closing date, the parties often negotiate the length of a postclosing limitations period for discovering and seeking a remedy based on an inaccurate representation or warranty. *See generally* Will Pugh, *Getting What You Bargained For: Avoiding Legal Uncertainty in Survival Clauses for a Seller's Representations and Warranties in M&A Purchase Agreements*, 12 J. Bus. Entrepreneurship & L. 1 (2019).

¶25 In this case, Ruby argues that, pursuant to the survival clause, any contract claim for breach of the APA's representations or warranties had to be filed within one year of the closing date. Ripp, by contrast, takes the position that the survival clause did not alter Wisconsin's statute of limitations for contract claims, WIS. STAT. § 893.43(1), which provides a six-year limitations period for bringing such claims.

¶26 Ruby's argument relies, in part, on the legal principles discussed above. Citing those principles, Ruby explains that, without the survival clause, the representations and warranties in the APA would not have survived the closing, and could not be the basis for a postclosing contract claim. Therefore, Ruby contends, the survival clause is the "functional inverse" of a statute of limitations because it creates a postclosing cause of action that would not otherwise exist, and the Wisconsin statute of limitations can have no bearing on any cause of action created by the survival clause.

¶27     There is some support for aspects of Ruby's argument;[11] yet, there is also authority that appears to point in the opposite direction.[12]  In the end, we need not decide what would happen in the absence of a survival clause—there is one here, and it explicitly provided that the representations and warranties survive the closing for a period of one year.  Nor do we decide how the state statute of limitations for contract claims would interact with a claim based on a survival clause containing language that differs from the language of the APA, or if there were no survival clause at all.  Our analysis centers on principles of contract interpretation and the specific language of the APA's survival clause.  As we explain in the following section of this opinion, we agree with Ruby that the language of the APA can only be reasonably interpreted as providing that any claim for breach of the representations or warranties must be filed within an agreed-upon one-year contractual limitations period.[13]

---

[11] *See* **GRT, Inc.**, No. CIV.A. 5571-CS *14 (citation omitted).

[12] *See, e.g.*, **Western Filter Corp.**, 540 F.3d at 949, 954 (applying California law to contract language providing that the representations and warranties "shall survive the Closing for a period of one year," and holding that California's four-year statute of limitations governs the breach of contract claims that survive the closing because the contract did not include express language that unambiguously shortened the statute of limitations).  We discuss the argument Ripp makes based on this holding from **Western Filter** in greater detail below, *infra* ¶¶36-37.

[13] We observe that some out-of-jurisdiction authorities use the term "contractual statute of limitations" when referring to this concept.  *See, e.g.*, **GRT, Inc.**, No. CIV.A. 5571-CS, *13; **Western Filter Corp.**, 540 F.3d at 951-52; *see also* KLING & NUGENT, *supra* § 15.02[2] at 15-25. We find this term unnecessarily misleading—in the scenario described by Ruby, the limitations period would not be determined by any statute, and would instead be determined by contract.  We therefore use the phrase "contractual limitations period" to refer to this concept.

## B. The Interpretation of the Survival Clause

¶28    The interpretation of a contract presents a question of law that this court decides independently. *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 2015 WI 65, ¶32, 363 Wis. 2d 699, 866 N.W.2d 679. "The primary goal … is to give effect to the parties' intent, as expressed in the contractual language." *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶22, 326 Wis. 2d 300, 786 N.W.2d 15 (internal quotation marks and citation omitted). When interpreting a contract provision such as the survival clause, we read the contract as a whole. *MS Real Est. Holdings, LLC v. Donald P. Fox Fam. Tr.*, 2015 WI 49, ¶38, 362 Wis. 2d 258, 864 N.W.2d 83. When possible, our interpretation should "give meaning to every word" in the contract. *Maryland Arms Ltd. P'ship*, 326 Wis. 2d 300, ¶45 (citation omitted). We avoid interpretations that would "render portions of a contract meaningless, inexplicable[,] or mere surplusage[,]" *id.*, or that would "read words into the contract [that] the parties opted not to include," *Pulkkila v. Pulkkila*, 2020 WI 34, ¶26, 391 Wis. 2d 107, 941 N.W.2d 239 (citation omitted).

¶29    Here, the parties dispute whether the survival clause is ambiguous. A contract provision is ambiguous if it is "susceptible of more than one reasonable interpretation." *Town Bank v. City Real Est. Dev., LLC*, 2010 WI 134, ¶33, 330 Wis. 2d 340, 793 N.W.2d 476. If a contract provision is unambiguous, meaning that it is susceptible of just one reasonable interpretation, we will construe it consistent with that unambiguous meaning. *See id.* Whether a contract is ambiguous is also a question of law. *Borchardt v. Wilk*, 156 Wis. 2d 420, 427, 456 N.W.2d 653 (Ct. App. 1990).

¶30    We now consider the parties' competing interpretations. As discussed, the survival clause provided that the representations and warranties

16

"shall survive the Closing for a period of one year from the Closing Date." The parties dispute what it means for the representations and warranties to "survive" the closing date, and what must occur during the one-year survival period. As we now explain, Ripp contends that the obligations imposed by the representations and warranties survive for one year following the closing, and that any lawsuit for breach of those obligations is subject to the state statute of limitations for contract claims. By contrast, Ruby contends that its obligations under the representations and warranties ended at closing, and that the right to sue for any breach of those obligations survives, but only for the year following that closing. As we now explain, we agree with Ruby.

### 1. Ripp's Interpretation

¶31 According to Ripp, Ruby had a "continuing obligation[]" to comply with its representations and warranties, and it was Ruby's continuing obligation to comply that survived the closing date. To that end, Ripp argues that the function of the one-year survival period was to limit Ruby's continuing obligations to the year that followed the closing. Therefore, Ripp contends, the effect of the survival clause was to allow Ripp to pursue contract remedies for any breach of the representations and warranties that occurred after the closing, but within the survival period. And, because the contract was silent as to when a legal action for a breach must be filed, Wisconsin's six-year statute of limitations sets forth the limitations period for filing such claims. *See* WIS. STAT. § 893.43(1).

¶32 Ripp's interpretation of the survival clause is founded on an unsupportable premise—that the representations and warranties in Section 7. of the APA imposed obligations on Ruby that continued beyond the closing date. This premise is unfounded because all of Section 7.'s representations and

warranties attested to facts and circumstances that Ruby represented and warranted to be true, at the latest, as of the closing date. More specifically, the representations and warranties addressed information that Ruby provided to Ripp before the parties signed the APA;[14] Ruby's knowledge of facts about the business and assets as of the APA's effective date and the closing date;[15] and actions that Ruby agreed to take between the effective date and the closing date. The only representation or warranty in the APA that imposed a continuing obligation on Ruby is the one titled "Conduct of Business in [the] Ordinary Course," and that obligation expressly terminated on the closing date. *See supra* ¶6. It makes sense that the obligation imposed in this paragraph would terminate on the closing date—following the closing, Ruby would no longer own the assets or operate the

---

[14] As discussed above, *supra* ¶6, in Section 7.I., Ruby represented and warranted that it had "provided" Ripp "with a list of [certain] customer accounts, contracts and other agreements," and had "delivered" copies of the written agreements and written summaries of the oral agreements.

[15] For example, as discussed above, *supra* ¶6, in Section 7.C., Ruby represented and warranted that it owned and could transfer title to the assets that were the subject of the purchase agreement; that certain equipment would be sold "AS IS, WHERE IS" in its "then present condition" at closing; and that accounts receivable would be sold "without any representation or warranty as to collectability, aging, or quality." Likewise, in Section 7.H., Ruby represented and warranted that, to its knowledge, the conduct of its business and its use of the purchased assets "d[id] not violate, nor [was Ruby] in default under, any law, regulation, rule, license, permit or order of any court or governmental commission." Finally, in Section 7.I., Ruby represented and warranted that Ruby had not breached any of the contracts that Ripp was purchasing, that "no event has occurred that, with notice or lapse of time, would constitute a breach" by Ruby or would permit any of the contracts to be terminated, modified, or accelerated, and that "no party ha[d] repudiated any provision of" the contracts.

To be sure, Ruby also represented and warranted that, to its knowledge, the contracts that Ripp was acquiring would "continue" to be "legal, valid, binding, enforceable and in full force and effect" after Ripp acquired the business; yet that language cannot reasonably be interpreted as obligating Ruby to take any action after the closing to ensure that the contracts would continue to be enforceable. Rather, it can only be understood as a representation and warranty that, as of the APA's effective date and again at closing, Ruby was not aware of any facts that would adversely affect the continuing enforceability of those contracts.

business. Ruby therefore could have no continuing obligation to maintain the assets or run the business consistent with its preclosing representations and warranties.

¶33 Looking at the APA as a whole, it is apparent that the parties knew how to draft language that imposed obligations that would continue beyond the closing date. By way of example, Section 10., titled "Conduct after Closing," explicitly imposed continuing obligations on both parties. As pertinent here, it provided that, "at any time, from time to time after the Closing upon [Ripp's] request," Ruby would "execute, acknowledge, and deliver to [Ripp] such further instruments … and shall take such other action as [Ripp] may reasonably request in order to more effectively convey, assign, transfer, and deliver the Purchased Assets," or "to assist in the collection or possession of any accounts receivable or any properties or assets and to otherwise fully effectuate the intention of the parties pursuant to this Agreement." Similarly, the covenant in Section 11.F. provided that Ruby would "take all necessary actions to transition the use of the Business website to [Ripp] immediately after the Closing, including providing such passwords and other identifications to allow [Ripp] to access and make changes to the website." And finally, Section 12.A. provided that Ruby agreed to not compete with the business for a "period of sixty … months after the Closing Date." Yet, no such language appears in the Section 7. representations and warranties. If the parties had intended to impose continuing obligations with respect to Ruby's representations and warranties, they could have expressly provided so, as they did in these other sections of the APA. We will not read language into the APA that the parties did not see fit to use. *See **Pulkkila***, 391 Wis. 2d 107, ¶26.

¶34    Because the representations and warranties did not set forth any continuing obligations that survive the closing date, Ripp's argument that the survival period was intended to provide a one-year window in which Ruby's breach might occur must also fail. Ripp's interpretation gives no meaning to the survival period, and would render it inexplicable surplusage. *Maryland Arms Ltd. P'ship*, 326 Wis. 2d 300, ¶45. We therefore conclude that Ripp's interpretation of the survival clause is not reasonable.

**2. Ruby's Interpretation**

¶35    In contrast with Ripp's interpretation of the survival clause, Ruby's interpretation gives reasonable meaning to the one-year survival period. As stated, Ruby argues that the representations and warranties addressed obligations that ended at closing, and that it is the right to sue for preclosing breaches of the representations and warranties that survived the closing date. According to Ruby, the one-year survival period functioned as an agreed-upon contractual limitations period for filing any claim based on a preclosing breach of contract or warranty.

¶36    Ripp's arguments to the contrary are not persuasive. It argues that the survival clause did not explicitly state that any claim or suit must be "initiated" within the survival period, and it also points to the Seventh Circuit Court of Appeals' ultimate conclusion in the *Western Filter* case. There, the federal court applied California law and determined that language comparable to the APA's survival clause did not expressly and unambiguously set forth a contractual limitations period that is shorter than California's statute of limitations for contract claims. *Western Filter Corp.*, 540 F.3d at 952-54.

¶37    The reasoning underlying the *Western Filter* decision does not apply to the APA, which is governed by Wisconsin law. This is because "California law

does not favor" contractual provisions that shorten an otherwise applicable statute of limitations—in California, such provisions are "strictly construed against the party invoking the provision," and they are ineffective unless they are written in "clear and explicit" language. *Id.* at 953. Wisconsin law, by contrast, does not disfavor contractual provisions that shorten the applicable statute of limitations, nor does Wisconsin require any specific language to effectuate that result. Indeed, "[p]ublic policy in this state permits parties to bind themselves by contract to a shorter period of limitation than that provided for by statute." *State Dep't of Pub. Welfare v. Le Mere*, 19 Wis. 2d 412, 419, 120 N.W.2d 695 (1963); *see also Keiting v. Skauge*, 198 Wis. 2d 887, 894-95, 543 N.W.2d 565 (Ct. App. 1995) (upholding provision in home inspections contract that shortened statute of limitations); *Olson v. Harnack*, 10 Wis. 2d 256, 260, 102 N.W.2d 761 (1960) (upholding provision in contract for the purchase of a farm that shortened statute of limitations).

¶38   It is true that the survival clause in the APA was not as robust as some other survival clauses that have been discussed by other courts and commentators,[16] and that the language of the APA could have been more explicit. Yet, the parties must have intended that the survival period mean something, and Ruby's interpretation gives reasonable meaning to the survival period. If the survival clause did not set forth a contractual limitations period, then we are at a loss for what it was intended to do, given that Ripp provides no reasonable alternative meaning.

---

[16] *See, e.g.*, *Western Filter Corp.*, 540 F.3d at 954 n.9 (quoting *Moreno v. Sanchez*, 106 Cal App. 4th 1415, 1420 (2003)); *Eckert*, 514 F.3d at 803; *Pentair, Inc.*, 545 F. Supp. 2d at 920-21; *Caddy Prods., Inc.*, No. CIV 05-301, *2; *Betco Corp.*, No. 14-CV-193-WMC, *12.

¶39 The weight of persuasive authority also buttresses Ruby's interpretation. Even where, as here, a survival clause in a purchase agreement did not contain explicit language that expressly limited the time for a buyer to commence a cause of action for a breach, many courts and commentators agree that a clause providing that the representations and warranties survive for a specified duration is intended to function as a contractual limitations period for commencing claims for breach of those representations and warranties.[17]

¶40 For all of these reasons, we conclude that the language of the survival clause can only be reasonably interpreted as having provided a one-year contractual limitations period. We therefore conclude that any claim for breach of the representations and warranties that was commenced more than one year after the closing date must be dismissed.

---

[17] *See, e.g.*, **GRT, Inc.**, No. CIV.A. 5571-CS, *14 ("Commentators and scholars … have made plain their view that the effect of a survival clause with a discrete survival period is to limit the time period during which a claim for breach of a representation and warranty may be filed."); **State St. Bank and Trust Co.**, 240 F.3d at 87 (a provision in a purchase agreement that states that representations "shall expire on the second … anniversary of the Closing" was "reasonably susceptible to only one meaning: that any claim based on warranties contained in the Purchase Agreement must be brought within [two years] of the closing"); **Latek**, No. 90 C 7230, **2-3 (a provision that representations "'shall survive ... for a period of 18 months from the Closing Date'" "clearly describes a contractual statute of limitations" (citation omitted)); **Caddy Prods., Inc.**, No. CIV. 05-301, **2-3 (a clause which provided that "[t]he representations and warranties contained in [certain sections of the purchase agreement] and all claims with respect to such representations and warranties hereunder, shall terminate upon the expiration of two … years following the Closing Date[]" was a contractual limitations period); **Epic Energy LLC**, No. CIV 19-0131, **4-5 (a provision stating that "[t]he representations and warranties set forth in [specified sections of the purchase and sale agreement] shall survive for six [] months following closing[]" set forth a contractual limitations period); KLING & NUGENT, *supra* § 15.02[2] at 15-25 n.40 (opining that language which expressly states that "the parties intend the language to operate as a contractual statute of limitations … really should not be necessary"); THOMPSON, MERGERS, ACQUISITIONS AND TENDER OFFERS, *supra* § 2:14 ("[I]t is clear that a provision of an acquisition agreement that states, for example, that a representation and warranty survives for a year, means that any claim that such representation was false must be made prior to the end of the one-year period. In other words, the survival period acts as a private statute of limitations on the claim.").

### C.  Ripp's Factual Allegations

¶41    We now consider Ripp's factual allegations in light of our interpretation of the survival clause.  As noted, Ripp is pursuing contract claims for breach of contract and breach of warranty.  The factual allegations underlying these contract claims are set forth above, *supra* ¶13, and will not be repeated at length here.

¶42    With two exceptions discussed further below, the factual allegations underlying Ripp's contract claims all pertain to representations and warranties that Ruby made (or, in some cases, expressly disclaimed) about the then-existing condition of the assets and the business as of the effective date and the closing date, and the conduct that Ruby would undertake between the APA's effective date and the closing date.  Specifically, the following factual allegations directly pertain to the representations and warranties identified, *supra* ¶6:   Ripp's allegations about the condition of the delivery vehicles, the water coolers, and the candy business; its allegations about the delivery vehicles and their license status and about a state-ordered directive to make improvements to the premises; its allegations about customer numbers; and its allegations about Ruby's failure to cash and apply customer payments or respond to customer voicemails.  Any contract claim based on these factual allegations must be dismissed because it is barred under the only reasonable interpretation of the survival clause.

¶43    As noted, there are two sets of factual allegations that do not directly pertain to Ruby's representations and warranties about the then-existing condition of the assets and business as of the closing date.  Specifically, Ripp alleges that "[c]ritical customer and business contact information had not been properly transferred" to Ripp as contemplated under the APA; and "[Ruby] had not

transferred ownership or access to … items[] including the business website, the company's bank accounts, and credit cards." These allegations are not tied to any language in the representations and warranties. They instead appear to relate to Ruby's other contractual obligations, as set forth in the APA, to take certain actions following the closing. See *supra* ¶33 (addressing Sections 10. and 11.F. of the APA).

¶44 The parties do not provide this court with a clear path forward for addressing these particular allegations. For its part, Ruby argues that all of Ripp's allegations are subsumed by the representations and warranties, but we are not persuaded in light of our conclusion that representations and warranties pertain to the facts and circumstances that Ruby represented and warranted to be true as of the closing date at the latest. For its part, although Ripp included these allegations in its complaint and referenced them in its appellate briefing, Ripp does not argue that these allegations constitute a breach of any part of the APA other than Section 7.'s representations and warranties. Ripp does not cite to Sections 10. or 11.F. of the APA at all in its appellate briefing, much less develop any argument that a breach of these sections of the APA would not be governed by the survival clause in Section 7. (or by any other survival clause in, or provision of, the APA).

¶45 Under the circumstances, we conclude that Ripp has forfeited any argument that the allegations identified above state contract claims that are not time barred. An assessment of the viability of any contract claim based on Sections 10. or 11.F. of the APA would raise a host of contract issues that we decline to consider on our own initiative. *See **State v. Pettit***, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) ("We cannot serve as both advocate and judge."). If Ripp wanted to preserve any argument that its complaint alleged breaches of contract other than the alleged breaches of the representations and

24

warranties it features in its briefing, it was incumbent on Ripp to provide the factual and legal support for those arguments. In the absence of any such argument, we conclude that Ruby is entitled to judgment on the pleadings as to any contract claim based on those allegations as well.

## II. Ripp's Misrepresentation Claims and the Economic Loss Doctrine

¶46 In addition to the contract claims, the complaint also asserts tort claims for intentional, negligent, and strict responsibility misrepresentation based on allegations that Ruby "willingly or negligently failed to disclose" "material facts" that Ruby "knew or should have known about the business." As we understand it, the material facts that form the basis for Ripp's tort claims are the problems with the assets that Ripp identified in the complaint and that also form the basis of the breach of contract and breach of warranty claims. Ripp asserts that, as a result of Ruby's misrepresentations, it "lost out on the benefit of [its] bargain and lost customers and business." To that end, the complaint seeks "restitution" for the alleged misrepresentations and "any further relief the Court deems just and equitable."

¶47 Ruby asserts that Ripp's misrepresentation claims are barred by the economic loss doctrine. The economic loss doctrine is a judicially created rule that precludes contracting parties from asserting tort causes of action as a means to recover "economic or commercial losses associated with the contract relationship." *Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶27, 283 Wis. 2d 555, 699 N.W.2d 205 (citations omitted).

¶48 For purposes of the doctrine, recovery for "economic loss" means the recovery of damages that a party incurs as the result of "a product failing in its intended use, or failing to live up to a contracting party's expectations." *Id.*, ¶29

25

(citations omitted). "Economic loss may be either direct or consequential[]"—a "direct" economic loss is a "loss in value of the product itself," and "consequential" economic losses are "[a]ll other economic loss[es] caused by the product defect, such as lost profits[.]" *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 246, 593 N.W.2d 445 (1999) (citations omitted). Economic loss does not include personal injury or damage to other property. *Kaloti Enters., Inc.*, 283 Wis. 2d 555, ¶29.

¶49    The economic loss doctrine "is based on an understanding that contract law and the law of warranty, in particular, is better suited than tort law for dealing with purely economic loss in the commercial area." *Id.*, ¶28 (citations omitted).    The purposes of the doctrine are to "'maintain the fundamental distinction between tort law and contract law,'" to "'protect[] commercial parties' freedom to allocate economic risk by contract,'" and to "encourage[] 'the party best situated to assess the risk of economic loss, the commercial purchaser, to assume, allocate, or insure against the risk.'" *Hinrichs v. DOW Chem. Co.*, 2020 WI 2, ¶29, 389 Wis. 2d 669, 937 N.W.2d 37 (citation omitted).  To this end, the doctrine has been applied to preclude contracting parties from asserting misrepresentation claims to recover for economic losses resulting from allegedly false warranties.  *See Selzer v. Brunsell Bros. Ltd.*, 2002 WI App 232, ¶33, 257 Wis. 2d 809, 652 N.W.2d 806 (addressing negligent and strict responsibility

misrepresentation claims); ***Hinrichs***, 389 Wis. 2d 669, ¶39 (addressing an intentional misrepresentation claim).[18]

¶50    Ruby asserts that Ripp's misrepresentation claims seek recovery for economic loss and are therefore barred by the economic loss doctrine. We agree. The "loss" that Ripp claims to have suffered as a result of Ruby's alleged misrepresentations is the benefit of its bargain—the assets were not as valuable as Ripp had expected, and the business had fewer customers and was not as profitable as Ripp expected it to be. This is a quintessentially economic loss. *See* ***Grams v. Milk Prods., Inc.***, 2005 WI 112, 283 Wis. 2d 511, 699 N.W.2d 167 (quoting ***East River S.S. Corp. v. Transamerica Delaval, Inc.***, 476 U.S. 858, 870 (1986), for the proposition that "the failure of the purchaser to receive the benefit of its bargain" is "traditionally the core concern of contract law").

---

[18] The economic loss doctrine originated in the context of defective product claims, *see* ***Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.***, 148 Wis. 2d 910, 911, 437 N.W.2d 213 (1989), and, over time, "Wisconsin courts have gradually enlarged the doctrine from its root to apply in other contexts," ***Van Lare v. Vogt, Inc.***, 2004 WI 110, ¶19, 274 Wis. 2d 631, 683 N.W.2d 46. *See, e.g.*, ***State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.***, 225 Wis. 2d 305, 348, 592 N.W.2d 201 (1999) (consumer transactions); ***Below v. Norton***, 2008 WI 77, ¶3, 310 Wis. 2d 713, 751 N.W.2d 351 (real estate transactions); ***Digicorp, Inc. v. Ameritech Corp.***, 2003 WI 54, ¶8, 262 Wis. 2d 32, 662 N.W.2d 652 (authorized distribution agreement); *but see* ***Insurance Co. of N. Am. v. Cease Elec., Inc.***, 2004 WI 139, ¶52, 276 Wis. 2d 361, 688 N.W.2d 462 (declining to extend the doctrine to contracts for the sale of "services").

No binding Wisconsin authority has applied the doctrine in the context of an asset purchase agreement negotiated between two businesses. *But see* ***Parnau v. Weiman***, No. 2013AP1795, unpublished slip. op. ¶¶1-5, 15-17 (WI App Jan. 21, 2015) (applying the economic loss doctrine to a contract for the sale of a publishing business based on the parties' apparent agreement that the doctrine "would ordinarily bar tort claims for damages arising out of a contract for [the] sale of business assets"). We cite this authored, unpublished opinion for its persuasive value pursuant to WIS. STAT. RULE 809.23(3)(b). Here, as in ***Parnau***, the parties appear to agree that the doctrine may apply in the context of a sale of business assets, even though, as explained in the text, Ripp argues that the doctrine does not bar the specific claims it makes in this case.

¶51     Ripp makes three arguments against the application of the economic loss doctrine.  None are persuasive.

¶52     First, Ripp asserts that the fraud-in-the-inducement exception to the economic loss doctrine preserves its misrepresentation claims.  Wisconsin courts have recognized "a narrow fraud in the inducement exception" to the economic loss doctrine.  *See **Hinrichs***, 389 Wis. 2d 669, ¶33 (citing ***Kaloti Enters., Inc.***, 283 Wis. 2d 555, ¶42).  This exception covers some but not all claims of fraud in the inducement, which is a species of intentional misrepresentation.  *See **Kailin v. Armstrong***, 2002 WI App 70, ¶31 n.21, 252 Wis. 2d 676, 643 N.W.2d 132.  To invoke the fraud in the inducement exception, a plaintiff must satisfy the elements of intentional misrepresentation;[19] and must also show that the alleged misrepresentation was made before the contract was formed and was "extraneous

---

[19] To state a claim for intentional misrepresentation, a plaintiff must allege that:

> (1) the defendant made a factual representation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud and to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to [the plaintiff's] detriment.

*Kaloti Enters., Inc. v. Kellogg Sales Co.*, 2005 WI 11, ¶¶12, 30, 283 Wis. 2d 555, 699 N.W.2d 205 (citation omitted).  In addition, "a person in a business deal must be under a duty to disclose a fact before [they] can be charged with a failure to disclose." *Id.*, ¶13.

Separately, we observe that, as with all misrepresentation claims, fraud in the inducement must be pleaded with particularity.  *See* WIS. STAT. § 802.03(2) ("In all averments of fraud … the circumstances constituting fraud … shall be stated with particularity.").  This requires that allegations of fraud "specify the particular individuals involved, where and when the misrepresentations occurred, and to whom [the] misrepresentations were made." *Id.*, ¶21 (citation omitted).  It is not apparent that Ripp's misrepresentation allegations satisfy the particularity standard, but we need not address this further because we conclude that the allegations fail to state a claim for other reasons addressed in the text of this opinion.

to, rather than interwoven within, the contract." *See* ***Kaloti Enters., Inc.***, 283 Wis. 2d 555, ¶42 (citations omitted).

¶53    Apart from identifying fraud in the inducement as an exception to the economic loss doctrine and listing its elements, Ripp develops no argument as to why its misrepresentation claims would qualify for the exception.  We could decline to address its argument on this basis alone.  *See* ***Pettit***, 171 Wis. 2d at 646 (we may decline to review arguments supported only by general statements that are not developed themes reflecting any legal reasoning).

¶54    We nevertheless address the argument and conclude that the fraud-in-the-inducement exception does not save Ripp's misrepresentation claims.  This is because, among other things, the complaint fails to allege any misrepresentation that is "extraneous" to the contract.  Wisconsin courts have explained that misrepresentations are "extraneous" to the contract if they "concern matters whose risk and responsibility [do] not relate to the quality or the characteristics of the goods for which the parties contracted[,] or otherwise involve[] [the] performance of the contract." ***Kaloti Enters., Inc.***, 283 Wis. 2d 555, ¶42.  Here, the only alleged misrepresentations that are identified in the complaint pertain to the quality or character of the assets that Ripp purchased and Ripp's expectations for that purchase—indeed, they are the same alleged misrepresentations that are the subject of Ripp's contract claims.  *See* ***id.***, ¶43.  Thus, the alleged

misrepresentations are interwoven with the APA, and do not fall within the fraud-in-the-inducement exception to the economic loss doctrine.[20]

¶55    Second, Ripp contends that its misrepresentation claims are not barred by the economic loss doctrine because it pled the misrepresentation claims "in the alternative" to its contract claims, and there is therefore no risk of a double recovery.  *See* WIS. STAT. § 802.02(5)(b) (allowing parties to plead inconsistent claims in the alternative).  We do not follow the logic of this argument.  Section 802.02(5)(b) provides no cover for Ripp because, when the economic loss doctrine applies, it limits transacting parties to pursuing contractual remedies for economic losses, and precludes such parties from pursuing any tort claims that might otherwise be available but for the doctrine.  *See Digicorp, Inc. v. Ameritech Corp.*, 2003 WI 54, ¶34, 262 Wis. 2d 32, 662 N.W.2d 652 (when a transacting party asserts a tort claim based solely on economic loss, the doctrine requires the party "to pursue only their contractual remedies").  Ripp is not entitled to pursue a tort claim for economic injuries—whether "in the alternative" or otherwise—if Ripp is limited by the economic loss doctrine to pursuing contract remedies.

¶56    Finally, Ripp appears to argue that the economic loss doctrine is inapplicable because Ripp may elect to seek equitable relief, rather than money

---

[20] In addition to arguing that the alleged misrepresentations identified in the complaint are interwoven with the APA, Ruby also asserts that Ripp cannot satisfy the fraud-in-the-inducement exception with respect to any extraneous representations because it cannot prove that Ripp reasonably relied on any extraneous representation.  This is so, Ruby argues, because the APA contained an integration clause and an exclusivity of representation clause, which provided that Section 7.'s representations and warranties are exclusive.  We need not address whether these clauses in the APA would preclude Ripp from claiming reliance on any extraneous misrepresentation because we conclude that the complaint fails to allege any misrepresentation that is extraneous to the terms of the APA.

damages for loss of value, based on Ruby's allegedly false representations and warranties. To that end, Ripp cites *Tietsworth*, which was one of the early Wisconsin cases addressing the economic loss doctrine. *Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶36, 270 Wis. 2d 146, 677 N.W.2d 233. It is unclear precisely what Ripp means to argue based on *Tietsworth* or how any such argument could save Ripp's tort claims from the application of the economic loss doctrine. The cited paragraph from *Tietsworth* provides that a party alleging that a contract was fraudulently induced may have "contract remedies at law and in equity," including "rescission" and "restitutionary damages," and that "[t]he economic loss doctrine does not bar these *contract* remedies for fraudulently induced contracts." *Id.* Thus, the quoted portion of *Tietsworth* addresses contract remedies, not tort remedies. And, as we have explained, Ripp's contract claims are barred by the limitations period in the APA's survival clause.

## CONCLUSION

¶57 For all these reasons, we conclude that Ripp's contract claims are time barred under the APA's survival clause, and that its tortious misrepresentation claims are barred by the economic loss doctrine. Therefore, we reverse and remand for the entry of an order dismissing Ripp's complaint.

*By the Court.*—Order reversed and cause remanded with directions.